JOSÉ ELIAS SANTIAGO AND ANA MATILDE GONZÁLEZ, his Wife,

*v.*

ANTONIO PONS NOGUERAS; JUAN PONS COLON AND AMADOR PONS COLON, Doing Business under the Name of Pons & Company; and AMERICAN COLONIAL BANK.

San Juan, No. 428.

---

JOSÉ ELIAS SANTIAGO AND ANA MATILDE GONZÁLEZ, his Wife,

*v.*

GIL RAMON GONZALEZ Y RODRIGUEZ.

No. 429.

---

JOSÉ ELIAS SANTIAGO AND ANA MATILDE GONZÁLEZ, his Wife,

*v.*

TEODORO MOSCOSO AND ALEJANDRINA MORA Y FAJARDO, his Wife.

No. 430.

JOSE ELIAS SANTIAGO AND ANA MATILDE GON-
ZÁLEZ, his Wife,

*v.*

ANA SEMIDEY, Widow of Antonio Costa; ANTONIO COS-
TA Y SEMIDEY; AGUSTIN COSTA Y SEMIDEY;
MARÍA COSTA DE PASALACUA AND JULIO PASA-
LACUA, her Husband; ANGELA COSTA DE PADILLA
AND JULIO M. PADILLA, her Husband; and CARLOTA
COSTA DE VIDAL AND EDUARDO VIDAL, her Hus-
band.

### No. 431.

1. Statement: The United States invaded Porto Rico on July 25, 1898;
the actual conflict ceased October 18, 1898; the treaty of peace was
signed December 10, 1898; ratifications were exchanged April 11, 1899;
on April 14, 1899, the President, "by indorsement," authorized the
military commander of Porto Rico to establish a provisional United
States court; June 27, 1899, the provisional court was established by
military order No. 88, by the commanding general of the department
of Porto Rico; the judicial system in force on July 25, 1898, had been
continued so by general order of the American military commander.
and the courts were open; the organic act establishing civil govern-
ment was passed April 11, 1900, and went into force May 1, 1900, and
by it the provisional court was discontinued and the present district
court of the United States for Porto Rico was constituted. Held:
That the President had not exceeded his powers and that the provi-
sional court was legally constituted.

2. An act of Congress ratifying a military order creating a court cannot
be held to be an *ex post facto* law, in derogation of vested property
rights, unless it first be shown that the creation of the court was
unauthorized and the court not even one *de facto*.

3. After the declaration of peace the military authorities had power, until
Congress provided a civil government for Porto Rico, to create new

tribunals and provide a form of government for the island. Their powers were not restricted to mere police powers.

4. The fact that the general order creating the provisional court specified that in civil matters it should have the jurisdiction of a circuit court of the United States did not prohibit it from deciding cases in which an amount less than $2,000 was involved.

5. Neither was the court without jurisdiction on the ground of a lack of diversity of citizenship because one party was a Spaniard and the others not citizens of a state.

6. The judgments of such a court cannot be attacked collaterally.

Opinion filed March 27, 1907.

*Messrs. Francis H. Dexter* and *Henry F. Hord,* attorneys for plaintiffs.

*Messrs. Charles Hartzell, Rodriquez Serra,* and *W. Vincent Robbins,* attorneys for defendants.

RODEY, Judge, delivered the following opinion:

These four suits are all brought by the same plaintiffs. The main question to be decided in each of them is the same, therefore they will be considered together.

The issue submitted, which is raised by a general demurrer in each case, brings in question and challenges the legality of the organization, existence, and power to act, of the United States provisional court of the department of Porto Rico. It was established June 27, 1899, by general order No. 88, promulgated by Brigadier General Davis, United States Volunteers, who was then commander of the military department here during the military government of the island.

The declarations in substance state: That plaintiffs are hus-

Santiago v. Nogueras.

band and wife, citizens of, and residents in, Porto Rico; that on and previous to the 11th day of April, A. D. 1900, they, or at least the husband, were, or was, the owner in fee simple, and in possession of several tracts or parcels of land, lots, houses, and premises mentioned in the several complaints, amounting in all to an area of about 650 cuerdas, situated at, in, and near the towns of Aibonito and Guayama in this island.

That previous to said date, the husband was indebted on his several promissory notes, to certain persons or estates, whose names are given, in a total sum of about 8,350 pesos of the then current money; that also on or previous to said date, the several holders of these promissory notes assigned them to one Antonio Alvarez Nava, a Spanish practising lawyer here, who, shortly thereafter and on and previous to April 11, 1900, instituted ordinary suits in assumpsit on the same, against these plaintiffs in the United States provisional court of the island. That at the time of or soon after the filing of said several suits, affidavits for attachment were also filed and writs issued thereon; that service was had, or pretended to be had, in each case, either upon the defendants personally, or, as to some of the cases, by leaving a copy of the summons, declaration, and writ at the usual place of abode of the defendants (plaintiffs here); and that all of the property described in these complaints was attached in said suits.

That these plaintiffs (defendants in the said suits in the provisional court) did not appear on the return days of the several writs; and that thereupon, or soon thereafter, defaults and judgments in each case were taken and entered against them.

That thereafter, on the creation of this present court, and on its coming into possession, under the act of Congress creating it, of the records of said provisional court, execution was sued

Santiago v. Nogueras.

out in all of said suits, and levied against the property which had thus been originally attached under the process from the provisional court, and all of said property was in due course sold by the marshal of this court, in different parcels, as severally specified, to the predecessors in interest of the defendants mentioned in these present suits, the alleged small amounts received therefor, less costs, being in each case duly credited on the judgment under which the writ issued; and that all of the defendants are now holders of or have pretended mortgage or other liens upon portions of the said realty, and claim to deraign their several titles or rights thereto from and under the deeds so made to the several purchasers at such sales.

It appears also that some time after this property was so sold on execution, these plaintiffs brought suits in this court to recover the same from the several persons to whom it had been so sold or afterwards transferred, on the ground that they had been deprived of their property without due process of law. On May 9, 1903, when one of the suits came on for trial, the then judge, on a demurrer to the evidence, instructed the jury to find a verdict for the defendants, and thereupon the balance of the cases were by the plaintiffs dismissed without prejudice. It is therefore claimed that the matter is *res judicata* as to the defendants mentioned in that particular suit, some or all of whom are now defendants in suit No. 428 here; and it is further contended that the entire subject is *stare decisis,* because of the instructions so given by the then judge to the jury.

It also appears that in three of the cases now being considered, Nos. 429, 430, and 431, there are Porto Ricans as parties plaintiff and defendant, and it is argued that, because of that fact, under a previous holding of this court, the jurisdiction is ousted. To this it is replied by counsel for plaintiffs, that the

jurisdiction does not depend upon any question of the amount involved, or of diverse citizenship, but involves a question arising under the Constitution and laws of the United States and the treaties of the country, and that because of such fact, jurisdiction is inherent here without reference to the amount involved or the citizenship of the parties.

Of course the point was promptly made in the several demurrers and on the hearing, by the defendants, that these suits are a collateral attack on the judgment of a properly constituted court, and that such procedure is not permissible under the authorities. To which plaintiffs replied that an unauthorized court, without legal right of existence, is powerless to render any judgment whatever, and that the same can be attacked collaterally or treated as a mere nullity by all persons affected by it, and that the taking of plaintiffs' property in the original suits was a clear violation of the "due process of law" clause of the Constitution.

As stated, plaintiffs here also insist, in support of their right to prosecute these actions, that even if it shall be held that said provisional court had legal existence and was authorized to act, that still, because it was organized by the general order which created it, manifestly to have such jurisdiction only as is exercised by a circuit or district court of the United States, as to these plaintiffs it had no jurisdiction, for lack of diverse citizenship between the parties, as the plaintiff in all of the original actions was a Spaniard and the defendants, although being native Porto Ricans, were each Spaniards also. Or that perhaps their citizenship was in abeyance under the 9th section of the treaty of Paris, which provides that: "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by Con-

gress." [30 Stat. at L. 1759.] And further, that it was with-. out jurisdiction because "a citizen of a territory is not a citizen of a state," within the meaning of the act of Congress fixing jurisdiction of United States courts, under the rule laid down in Hooe v. Jamieson, 166 U. S. 395, 41 L. ed. 1049, 17. Sup. Ct. Rep. 596.

The jurisdiction is also denied because, as to some of the cases brought against them in said provisional court, the amount involved was less than the statutory minimum of $2,000. One of the counsel for plaintiffs at the hearing, in answer to the court's inquiry as to why such an apparently important question as this had not heretofore been in some manner brought before the Supreme Court of the United States, stated that sev-- eral years ago he had attempted to do so on an application for: a writ of habeas corpus in Ex parte Baez, 177 U. S. 378, 44 L. ed. 813, 20 Sup. Ct. Rep. 673, but unfortunately he went out of court on account of the lapse of the sentence of his. client, which had converted the proceeding into a moot case, which of course the court very properly refused to entertain, there being no restraint of the applicant's liberty.

Counsel for all parties have exhibited commendable zeal in gathering the authorities bearing on the questions to be considered, and, in addition to having orally argued with clearness and ability the points contended for, filed briefs in which all the leading authorities are collated and intelligently commented on. Indeed, instances are rare in this court where a great question has been more forcibly presented. Our acknowledgments are cheerfully accorded.

The occurrences surrounding and following the Spanish-American War created many new situations. Conditions often resulted in unusual but unavoidable executive action. Radi-

Santiago v. Nogueras.

cally new congressional legislation became necessary, resulting
in the grave problems that culminated in the insular decisions,
—problems which can hardly be said to be well settled in all
their bearings even yet.　Indeed, the judicial task of defining
the powers of Congress and the Executive, and fixing the rights
of the people in our new possessions under our Constitution,
laws, and system of government, has not been an easy one.　A
judicial guess on a much controverted and close legal proposi-
tion, even with an equal chance of being right, is never expe-
dient, save perhaps ( ?) in a court of last resort; hence our
task has not been easy.

At the outset, so as to understand the relation of points made,
and the force of particular quotations or argument, it may· be
well to keep in mind a few dates.　The peace protocol during
the late war between the United States and Spain was signed
and actual conflict ceased October ·18, 1898; the treaty of peace
between the two contending nations was signed at Paris, De-
cember 10, 1898; the ratifications of the same were exchanged
and the treaty proclaimed by the President at Washington on
April 11, 1899; the Foraker act, establishing civil government
in Porto ·Rico, passed Congress April 11, 1900, and took ef-
fect nineteen days later, on May 1st of that year.

On April 14, 1899, three days after the ratification of this
treaty, the President of the United States, as Commander in
Chief of the Army, authorized, as it is claimed, by an "indorse-
ment," the creation of the provisional court in question, by the
military authorities of the department of Porto Rico, and the
same was established about two and a half months thereafter, on
June 27, 1899, by G. O. No. 88 before referred to, at a time,
as it is claimed, when all war had ceased and absolute peace
prevailed; but the military authorities were then, and for more

Santiago v. Nogueras.

than a year thereafter remained, in complete control of the government of the island, until the inauguration of civil government under the Foraker act aforesaid, on May 1, 1900. A copy of this general order is set out in full at the end of this opinion, and a reading of it is necessary to a full understanding of the views herein expressed.

It would not be profitable at this time to refer in detail to all the points and authorities made in the able briefs of both counsel for plaintiffs here, or to follow the references through the text writers and the adjudicated cases to date. It is sufficient to state, as a result of the examination made, that it may be conceded—perhaps even be laid down as a general proposition —that the President, as Commander in Chief of the Army of the United States, ordinarily has no power to establish judicial tribunals in times of peace, over territory of the United States, save, perhaps, when the same is under military control and Congress has not yet acted to establish civil government therein. But if such tribunals are established during a time of war, in territory in charge of the military, the war power of the military branch of the government cannot be questioned. But it would also seem to be pretty well established that such courts may continue thereafter, even though a treaty of peace may be entered into between the belligerents in the meantime, until such time as Congress (which is admittedly, under our system of government, in times of peace, vested with sole power in that regard) sees fit to establish a system of civil government in the quieted, ceded, or conquered district or country. In fact, this very doctrine is stated in the celebrated case of Cross v. Harrison, 16 How. 164, 14 L. ed. 889, which decision was rendered as long ago as 1853, and has ever since remained the guide-light from which the course of all later decisions appears

to have been taken. It was held in that case that: "The formation of the civil government in California, when it was done, was the lawful exercise of a belligerent right over a conquered territory. It was the existing government when the territory was ceded to the United States, as a conquest, and did not cease as a mat-. ter of course, or as a consequence of the restoration of peace; and it was rightfully continued after peace was made with Mexico, until Congress legislated otherwise, under its constitution-. al power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

Four years later, in 1857, the Supreme Court again, in Leitensdorfer v. Webb, 20 How. 176, 15 L. ed. 891, with reference to the action of the military authorities after the conquest in New Mexico, reiterated this same doctrine and held that: "The executive authority of the United States properly established a provisional government [in New Mexico], which ordained laws and instituted a judicial system; all of which continued in force after the termination of the war, and until modified by the direct legislation of Congress, or by the territorial government established by its authority."

And here we might on this matter state that not only did Gen. Kearney establish provisional courts in New Mexico after the conquest in August, 1846, and up to the time of the treaty of Guadalupe-Hidalgo in February, 1848, but, in addition, he provided for, and there was held, a session of a provisional legislative assembly in 1847, some of the enactments of which are still in force. Moreover, in 1848–50, while still under military government, New Mexico held a constitutional convention, erected a full state government, and elected a member of Congress. Its legislature immediately assembled and promptly

Santiago v. Nogueras.

elected two United States Senators, whose advent in Washington to claim their seats was anticipated by Congress only by a few days in the enactment of the organic act creating the jurisdiction into an organized territory. See speeches of the writer of this opinion, advocating the admission of New Mexico and other territories into the Union as states, in hearings before the House Committee on Territories, and in Congressional Record of 57th and 58th Congresses.

It will be recalled also that California, while under a military government, and long after the date of the treaty of Guadalupe-Hidalgo aforesaid, erected a full state government and was actually admitted to the Union as a state in 1850, without ever having been organized as a territory at all.

Particular stress, as supporting their side of this controversy, is laid by counsel for plaintiffs here on the decision in the celebrated Civil-War-days case of Ex parte Milligan, 4 Wall. 2, 18 L. ed. 281, which was decided in 1866. We, however, fail to see its application here, because, instead of referring to conquered territory, it had relation entirely to territory of a state of the Union,—Indiana,—where it was sought to try a citizen by a military commission at a time when the courts were open and unobstructed in their functions, and when the Federal authority had not been opposed in that state. This is made clear because in The Grapeshot (The Grapeshot v. Wallerstein) deceided in 1869, 9 Wall. 129, 19 L. ed. 651, it was held that: "When, during the late Civil War, portions of the insurgent territory were occupied by the national forces, it was within the constitutional authority of the President, as Commander in Chief, to establish therein provisional courts for the hearing and determination of all causes arising under the laws of the state or of the United States, and the provisional court for the

state of Louisiana, organized under the proclamation of October 20th, 1862, was, therefore, rightfully authorized to exercise such jurisdiction."

In United States v. Reiter and United States v. Louis, tried together as Fed. Cas. No. 16,146 (1865), it is stated that at the time of the establishment of the provisional court in Louisiana, a considerable part of that state was held by the forces of the United States, and that in such a case there can be no doubt that the right and duty of such military forces is to furnish a government for the people.

And again, in 1874, in New Orleans v. New York Mail S. S. Co. 20 Wall. 387, 22 L. ed. 354, the court sustained a lease made by the mayor of New Orleans, acting under power conferred on him by the military government, although the lease ran for ten years, and within a year after it was made, the government of the city was handed back to the city authorities.

In Mechanics' & T. Bank v. Union Bank, 22 Wall. 276, 22 L. ed. 871, it is held that:

"The Constitution did not prohibit the creation by military authority of courts for the trial of civil causes during the Civil War in conquered portions of the insurgent states. The establishment of such courts was the exercise of the ordinary rights of conquest.

"A court established by proclamation of the commanding general in New Orleans, on the 1st of May, 1862, on the occupation of the city by the government forces, will, in the absence of proof to the contrary, be presumed to have been authorized by the President."

It is argued here that, because this particular provisional court was established after the exchange of ratifications of the treaty of peace, it cannot therefore be claimed to be authorized

under the supposed rule that permits existing conditions, as they were when peace was declared, to continue until Congress acts. In reply, defendants here are contending that, although this provisional court was established after the date of the treaty, still it was but an incident in the judicial system of the island that had been completely overthrown and changed after the date of Gen. Miles's occupation of the island, on July 25, 1898, and most of which local courts were established even after the provisional court, and that therefore no line of division can be drawn between this provisional court and any of the other or local (Spanish-speaking) courts on the island, because, as stated, all the latter were established or remodeled by general orders of the military governor or commander about a month and a half later than this provisional so-called United States court. In fact, an entirely new local judicial system was created by general order No. 118, on August 16, 1899.

In October, 1899, Hon. Chas. E. Magoon, now provisional governor under our intervention in Cuba, then law officer of the division of insular affairs of the War Department at Washington, submitted to Hon. Elihu Root, then Secretary of War, several reports which were afterwards compiled and published by the government under the title of: "The Law of Civil Government under Military Occupation." We might pause here to say that Governor Magoon has placed all lawyers and courts having questions such as are here involved, to consider, under a lasting obligation for the production of this work. He, of course, then realized, as did everybody on the island here and in the nation, the inconvenience and embarrassments that were arising because of the nonaction of Congress, and the leaving of Porto Rico and other insular possessions under military control. On page 25 of his work he states: "There exists an ob-

Santiago v. Nogueras.

vious necessity of creating and establishing a permanent civil government in Porto Rico. The authority necessarily to be exercised in accomplishing this work is vested in Congress. . . . The creation of a permanent civil government for Porto Rico calls for the exercise of legislative powers; and the Constitution provides that, 'all legislative powers herein granted shall be vested in Congress.'" Then he proceeds to quote approvingly from the authorities with reference to the powers of the President of the United States, as follows: "It, however, is well settled by the Supreme Court, that, as constitutional Commander in Chief, he is authorized to form a civil or military government for the conquered territory during the war; and that, when such territory is ceded to the United States, as a conquest, the existing government so established does not cease as a matter of course or as a consequence of the restoration of peace; that, on the contrary, such government is rightfully continued after the peace and until Congress legislates otherwise."

Here we pause to remark that we are unable to see why a system of courts for any such conquered or ceded territory is not a necessary part of any such government.

And after reviewing at considerable length certain other lines of authorities, he proceeds, on page 30 of his work, to state, on his own account, that: "It is also important to ascertain if the head of the military government of Porto Rico may exercise the powers of the judicial branch of government. The functions performed by the judiciary are essential to good government, and therefore must be performed in Porto Rico. The jurisdiction to exercise judicial authority in territory to which the sovereignty of the United States has attached differs from that of legislation, in that the jurisdiction to legislate is con-

ferred upon Congress by the fact of the sovereignty attaching, while the Federal courts of the United States, being dependent upon Congress for their territorial and other jurisdiction, must await appropriate action by Congress for jurisdiction over newly acquired territory. Meanwhile the necessity for judicial action continues, and the military government is called upon to meet the necessity. Article 12 of the treaty of peace (1898) clearly contemplates that the ordinary courts of the prior government will continue in existence, and such is the usage of nations. If these courts are found inadequate to deal with the domestic or internal situation arising by reason of the questions involved in the relations sustained by the inhabitants of the island, *inter se*, I am of opinion that the head of the military government of the island would be authorized to discharge the necessary functions, and, to accomplish said purpose, may designate instruments therefor; to wit, courts." And these remarks of Governor Magoon bring to mind the fact, that of necessity the so-called United States provisional court in question here was only a local military court, and that it was designated as a "United States" court only as a matter of convenience, and hence the judiciary and practice acts can have no binding force upon it, save in an incidental way.

If we are looking for precedent, it must not be forgotten that our military forces remained in Cuba for a considerable length of time after Spain had relinguished her sovereignty herein, and that our military government established there exercised practically all powers of government. So, too, for a much longer period was this the case after the Philippines had been ceded to the United States by Spain. It will be recalled that millions of people who live in those islands were for several years, and in fact are to a large extent yet, governed by a commission,

II. PORTO RICO.—31.

and that when Congress, on the 1st of July, 1902 (32 Stat. at L. 691, chap. 1369), passed the act to establish limited civil government in said islands, which, perhaps, has not even yet been fully established, the first section of the act, at very considerable length, proceeded to ratify the action of the President in creating the Philippine commission to exercise all the powers of a complete system of government, as he had done, and most of which was done after the date of the treaty of Paris.

Congress evidently deemed the action of the President in the Philippines to have been proper and necessary, and we think the same is true as to Porto Rico; and it also may, we submit, be fairly presumed that Congress ratified the acts of the President under the military government here. His acts have never been disapproved by Congress, although it has had ample opportunity to do so. In fact, it may with force be contended that it has not only recognized, but has, as stated, ratified the creation of this military court, and also of all other courts in the island, because, in §§ 33 and 34 of the Foraker act (31 Stat. at L. 77, chap. 191), it refers to, and by necessary implication validates, all the military general orders creating courts, issued during the military occupation of the island, and most of which general orders as to courts were, as stated, of date subsequent to the treaty; and further provides (§ 34) as to this present court, that : "The United States district court hereby established shall be the successor to the United States provisional court established by general orders numbered eighty-eight, promulgated by Brigadier General Davis, United States Volunteers, and shall take possession of all records of that court, and take jurisdiction of all cases and proceedings pending therein, and said United States provisional court is hereby discontinued."

Santiago v. Nogueras.

It will not do to reply to this, that not even Congress, by an *ex post facto* law, could ratify the act of an unauthorized court that had violated vested property rights, because it must first be shown that the court was unauthorized, and that it was not even a *de facto* court.

· It is not at all certain that, even if it could be held that the creation of this provisional court was wholly unauthorized, still it might not be held to be a *de facto* court under the circumstances, the judgments of which would stand as against collateral attack, which is certainly what is being attempted here. Counsel for defendants here, in cause No. 431, has filed a very carefully prepared brief on this phase of the case, which we do not think it necessary to refer to in detail, and in support of which he cites State v. Carroll, 38 Conn. 449, 9 Am. Rep. 409, which it appears is the leading case on the subject; and shows that this case was approved in a long line of decisions in the Supreme Court of the United States, such as Norton v. Shelby County, 118 U. S. 425, 30 L. ed. 178, 6 Sup. Ct. Rep. 1121; Re Manning (Manning v. Weeks) 139 U. S. 504, 35 L. ed. 264, 11 Sup. Ct. Rep. 624; Ball v. United States, 140 U. S. 118, 35 L. ed. 377, 11 Sup. Ct. Rep. 761; McDowell v. United States, 159 U. S. 601, 40 L. ed. 274, 16 Sup. Ct. Rep. 111, and many others, in many of which the facts were such as to lend great force to his contention that the provisional court in question, even though created after the treaty of peace, by a military order, under authority of the President of the United States as Commander in Chief of the Army, was a *de facto* court.

. It will probably be conceded that one of the points decided by the majority opinions in the insular cases is that the Constitution of the United States does not, as a whole, of its own

force, extend to newly-acquired territory, until Congress shall affirmatively so enact; at least, this is what we gather from the opinion of Mr. Justice Brown in Rassmussen v. United States, 197 U. S. 533, 49 L. ed. 869, 25 Sup. Ct. Rep. 514.

The conditions in the island of Porto Rico at the time of the creation of the provisional court were peculiar. The treaty of peace had left the citizenship and status of the inhabitants of the island "up in the air." Congress had done nothing in the way of establishing a system of civil government, and did not do so for nearly or more than a year thereafter. Of necessity, the military authorities had to supply a government until Congress should act. If this is not so, then the inquiry would naturally arise, what was to happen to the island during the interim? Can it be said that the President should have at once called Congress in special session to enact laws for the government of the island? Or that, whenever Congress fails to establish civil government in newly-acquired territory after a treaty, that the military authorities must forsooth immediately withdraw, or that, if they remain, their powers are restricted to the merest police powers? And that they cannot, during such time, provide for any new, or make any change in existing, tribunals? With all due respect to the eminent authorities that, at least by implication, affirm this doctrine, we believe the contrary rule is now settled. We further believe that, save as to alienating the public domain or affecting the rights of the United States, and perhaps as to some other matters, the military authorities during such interim not only have power, subject to those clauses of the Constitution that restrict all officers of the United States everywhere, but it is their duty to provide a government sufficient for the needs of the people of the conquered or ceded country until Congress shall act; and we be-

lieve that this power certainly includes the power to provide a proper judiciary as a necessary part of such government.

We fail to appreciate the force of the many citations in the briefs for plaintiffs, referring to the nullity of the courts of the Confederate states, because such courts were not established by any branch of the government of the United States, but by its enemies. They were not established by our Congress, by our President, or by our military commanders. But it will be noticed that the courts established in occupied belligerent portions of the rebellious states, by our President or military authorities during the Civil War, as above referred to, were sustained.

The treaty of Paris made no provision for the temporary government of this island, but in § 12 it appears to contemplate that suits pending in the Spanish courts at the date of the treaty should be transferred to whatever courts were substituted therefor.

An examination of the military orders issued, as we have already stated, will show that the courts of the island had been radically changed before the signing of the treaty or its ratification, and that a large number of all sorts of existing laws were amended or substituted by military orders, and entirely new laws at times promulgated. In fact, as we have shown, the entire judicial system of Porto Rico was changed and reorganized by G. O. No. 118, dated August 16, 1899, a month and a half after the creation of this provisional court, and several months after the ratification of the treaty, and an entirely new system of courts for the island was created. All the old courts of first instance, audiencias, and other courts of the island, which had existed up to that date by the order and sufferance of the military authorities, were annulled and in lieu thereof

Santiago v. Nogueras.

municipal and district courts and a supreme court—a new system, in fact, from the lowest to the highest tribunal—were established. These courts, including the provisional court, continued to exist up to the time of the passage by Congress of the Foraker law, on April 11, 1900, and the establishment of civil government under it, on May 1st of that year. And some of the local courts continued until their reorganization was effected by various acts of the local legislative assembly of Porto Rico several years after the establishment of civil government.

An examination of the 1st section of G. O. No. 88, creating this provisional court, will, we repeat, plainly show that it was nothing but a military expedient, made necessary by existing conditions, and although called such, it was in no sense a United States court, while for purposes of convenience, and to avoid having to write out the judiciary and practice acts in the order itself, they were referred to therein. It will be seen that it had one law judge and two Army officers as associate judges of fact; that its jurisdiction was of the broadest kind, and in certain matters was fixed at a minimum as low as $50. We therefore cannot see the application of the rather lengthy list of citations and array of quotations made to us by counsel for plaintiffs, against its jurisdiction under the laws and decisions referring to jurisdiction and practice in circuit and district courts of the United States. Those matters might have been entertained if presented to the provisional court itself at the proper time. If it had any authority for its existence, they are certainly improper here as a collateral attack.

We are not informed as to how much litigation was tried before this provisional court during its eight or nine months of existence, but it is said to have been quite considerable. If the doings of this provisions court are to be overthrown, then

Santiago v. Nogueras.

the doings of all the insular courts, also established after the treaty, in like manner must be overthrown, and the consequences to property rights that would ensue would be appalling. We are aware that this fact should not militate against plaintiffs' right to recover their property if they were wrongfully deprived of it, and the matter is mentioned only because of its importance and to justify us in acting with caution. The serious objection which of course can always be raised to the action of a military court is, that there is usually no appeal from it to the Supreme Court of the United States; but this objection lies as well against the doings of all the local insular courts as against this so-called United States provisional court.

Let us not forget that these plaintiffs, although, as we see on an examination of the record, they were, as we believe, properly cited and had what we feel was sufficient reasonable notice of the suits in the provisional court, failed to appear therein or in any manner plead, answer, or demur in the causes against them, but let the same go to judgment and their property be sold thereunder. Even after judgment they did not go before the provisional court and move to have the action set aside, or for a rehearing, or take any action in the premises even after the organization of this court. And when by law the records from the provisional court were brought here, they did not make any effort, as they probably might have done, for a rehearing, or to take an appeal to the Supreme Court of the United States. Instead, they stood by, without giving any notice, or making any complaint, and let innocent purchasers take their property, and go into peaceable possession of it, and use it as their own and sell it to others, and years after come and sue to recover it. Ordinarily, the doctrines of laches and estoppel would have bearing against them.

Santiago v. Nogueras.

It is unnecessary, perhaps, to lay it down as a decided point in this case, but it does seem that due process of law under the Constitution in the several states of the Union, or of the territories over which the Constitution has been extended in its entirety, implies quite different rules of procedure than it does in a locality such as Porto Rico was in the interim between the treaty and the organization of civil government.

During the nine or ten months we have been upon this bench, it has come to our knowledge as history, although it appears now to have entirely passed away, that the feeling between the Spanish official class and the native Porto Ricans previous to and immediately after the American occupation was not at all cordial. As no one but Porto Ricans and Americans, or those who would acknowledge allegiance to our government, could hold office under the military occupation, it resulted that Spaniards were subject to resentments from those who, with or without reason, believed they had formerly been oppressed by them. Moreover, a Spanish-speaking people such as the Porto Ricans were, in the nature of things, immediately after the change of sovereignty, could not satisfactorily administer our laws, or be understood by the large majority of American officials and citizens crowding into the island; and a "United States court" probably became, and was, as necessary as the policing of the island. In fact, we think this is manifest from the 1st section of general order No. 88, before referred to. The court was probably organized from sheer necessity.

We hold, therefore, that as to newly-acquired territory, for which Congress has not as yet established a system of civil government, the military authority established therein during the conquest, even after the date of a treaty of peace, continues in plenary control in the exercise of its own prescribed powers

Santiago v. Nogueras.

until it is duly displaced by the legislation of Congress. Common sense as well as the interests of the nation, and, indeed, the interests of the conquered, require this. The opinions of mankind approve it. Congress itself has repeatedly sanctioned it, and we feel that it is now so firmly established that it cannot be denied.

. Many things are being done in these modern times by Congress itself and by the Executive, that, under the Constitution, they have always had power to do, but the necessity for the exercise of which only arose out of our recent great political and industrial expansion. That which subserves the interests of the nation as a matter of policy, and is necessarily an implied power of the legislative or executive branch of the government, is sanctioned by the Supreme Court.

Therefore, as we think the United States provisional court for Porto Rico was properly established and had jurisdiction of the original suits, out of which the litigation arose, plaintiffs have slept upon their rights, if they could have asserted any, and all their objections to the so-called want of due process of law, and their insistence that they can make this collateral attack on the judgment of a competent court, must be denied.

For these reasons, we feel that the general demurrer to the declaration in each of the above entitled cases should be sustained with costs, and the suits dismissed, and it is so ordered.

---

GENERAL ORDERS, NO. 88.
HEADQUARTERS DEPARTMENT OF PORTO RICO.
San Juan, June 27th, 1899.

1. In view of existing and steadily increasing legal business requiring judicial determination, which does not fall within the jurisdiction of the local insular courts, such as smuggling goods in evasion of revenue laws,

Santiago v. Nogueras.

larceny of United States property, controversics between citizens of different states and of foreign states, violation of the United States postal laws, etc., etc., and pursuant to authority of the President of the United States, conveyed by indorsement of April 14th, 1899, from the Acting Secretary of War, and after full conference with the Supreme Court and members of the bar of the island, a United States provisional court is hereby established for the department of Porto Rico.

2. The judicial power of the provisional court hereby established shall extend to all cases which would be properly cognizable by the circuit or district courts of the United States under the Constitution, and to all common-law offenses within the restrictions hereinafter specified.

3. Art. 3, § 2, ¶ 1, of the Constitution, is as follows: "(1) The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, unaer their authority; to all cases affecting ambassadors, other public ministers, and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more states; between a state and citizens of another state; between citizens of different states; between citizens of the same state claiming lands under grants of different states; and between a state, or the citizens thereof, and foreign states, citizens, or subjects."

4. The decisions of said court shall follow the principles of common law and equity as established by the courts of the United States, and its procedure, rules, and records shall conform as nearly as practicable to those observed and kept in said Federal courts. Its terms and places of sitting shall be fixed by the court at such times and places as may be most convenient for the parties litigant, and to insure the expeditious transaction of business.

5. The provisional court shall consist of three judges, one of whom shall be known as the law judge, and the other two as associate judges, one United States district attorney, one marshal, one clerk, three deputy clerks, one stenographer and reporter, one interpreter, one bailiff and janitor, and one messenger. The law judge shall preside and shall determine and decide all technical questions of law. A majority vote of the bench shall determine all questions of fact. The jury system may be introduced or dispensed with in any particular case in the discretion of the court.

6. The judges of the provisional court shall be clothed with the powers vested in the judges of the circuit or district courts of the United States.

7. The district attorney shall be authorized to present to the court informations against all parties for violations of United States statutes and

Santiago v. Nogueras.

regulations. He shall also, in like manner, present informations for violations of orders issued by the department commander, relating to civil matters, which may be referred to him from these headquarters. It shall also be his duty to represent the United States in all suits to which it is a party, and to perform such other duties as usually pertain to the district attorneys in the Federal courts of the United States.

8. In order to define more clearly certain branches of the criminal jurisdiction of the provisional court, it is hereby provided that it shall include and be exclusive in the following classes of cases: (1) All offenses punishable under the statutory laws of the United States, such as those indicated in ¶ 1 of this order; (2) offenses committed by or against persons, foreigners or Americans, not residents of this department, but who may be traveling or temporarily sojourning therein, or against the property of nonresidents; (3) offenses against the person or property of persons belonging to the Army or Navy, or those committed by persons belonging to the Army or Navy, not properly triable by military or naval courts; but not including minor police offenses; (4) offenses committed by or against foreigners or by or against citizens of another state, district, or territory of the United States, residing in this department.

9. Cases arising under article 11 of the treaty of peace between the United States and Spain will be determined as therein provided.

10. In civil actions, when the amount in controversy is fifty dollars ($50) or over, and in which any of the classes of persons above enumerated in paragraph 8 are parties, or in which the parties litigant by stipulation invoke its jurisdiction, shall be brought in the provisional court; Provided, that in the determination of all suits to which Porto Ricans are parties, or of suits arising from contracts which have been or shall be made under the provisions of Spanish or Porto Rican laws, the court shall, as far as practicable, conform to the precedents and decisions of the United States courts in similar cases which have been tried and determined in territory formerly acquired by the United States from Spain or Mexico. In all other civil actions the case shall lie within the jurisdiction of the proper insular court, as now provided by local law.

11. If any party litigant shall feel aggrieved by the judgment or decree of said court, a stay of ninety days shall be granted such party before the execution of such judgment or decree, upon the filing of a bond by him with sureties in an amount and with such conditions as the court may determine, for the purpose of allowing such party to make application to the Supreme Court of the United States for a writ of certiorari or other suitable process to review such judgment or decree. But if, at the end of said ninety days, such process has not been issued by the Supreme Court, execution shall forthwith issue.

Santiago v. Nogueras.

12. The department commander will exercise the power of pardon, commutation, or mitigation of punishment in criminal cases.

13. All fees, fines, and costs paid to the clerk of the provisional court shall be turned over by him at the end of each calendar month to the treasurer of the island with a statement of the sources from which they are received.

14. Members of the bar of Porto Rico will be admitted to practice in the provisional court upon presentation of a certificate signed by the president of the supreme court of Porto Rico, certifying to their professional standing.

15. All lawyers practising in the provisional court who are unfamiliar with the English language shall be permitted, upon application, to use their own interpreter when addressing the court.

16. The court shall adopt an appropriate seal, which will be procured by the treasurer of the island. The clerk of the court shall have the custody of the seal for use in attesting legal documents in the usual manner.

17. In accordance with the provisions of paragraph 5, of this order, the following appointments are announced to take effect July 1st, 1899:

To be law judge, Noah Brooks Kent Pettingill.

To be provisional United States attorney, J. Marbourg Keedy.

The following officers are hereby detailed on the special duty set opposite their respective names:

Major Eugene D. Dimmick, 5th U. S. Cavalry,   } Associate judges of the U.
Major Earl D. Thomas, 5th U. S. Cavalry,      }    S. provisional court.

1st Lieutenant Robert Alexander, 11th U. S. } Clerk of the U. S. pro-
    Infantry,                      }        visional court.

Private Samuel C. Bothwell, Troop D, 5th U. S. Cavalry, is detailed on special duty as marshal of the U. S. provisional court.

The necessary deputies will be detailed in subsequent orders.

The officers named will proceed to San Juan and report to the adjutant general of the department.

The travel enjoined is necessary for the public service.

By Command of Brigadier General Davis.

W. P. Hall,
Adjutant General.