Mr. Justice STRONG
delivered the opinion of the court.
The facts of this case, so far as they are necessary to a proper understanding of the question raised, are the following :
In May, 1862, after the capture of New Orleans by the United States army, General Butler, then in command of *294 the army at that place, issued a general order appointing Major J. M. Bell, volunteer aid-de-camp, of the division staff, provost judge of the city, and directed that ho should be obeyed and respected accordingly. The same order appointed Captain J. II. French provost marshal of the city, and Captain Stafford deputy provost marshal. A few days after this order the Union Bank lent to the plaintiffs the sum of $130,000, and subsequently, the loan not having been repaid, brought suit before the provost judge to recover the debt. The defence was taken that the judge had no jurisdiction over civil cases, but judgment was given against the borrowers, and they paid the money under protest. To recover it back is the object of the present suit, and the contention of the plaintiffs is that the judgment was illegal and void, because the Provost Court had no jurisdiction of the. case. The judgment of the District Court was against the plaintiffs, and this judgment was affirmed by the Supreme Court of the State. To this affirmance error is now assigned.
The argument of the plaintiff's in error is that the establishment of the Provost Court, the appointment of the judge, and his action as such in the case brought by the Union Bank against them were invalid, because in violation of the Constitution of the United States, which vests the judicial power of the General government in one Supreme Court and in such inferior courts as Congress may from time to time ordain and establish, and that under this constitutional provision they were entitled to immunity from any liability imposed by the judgment of the Provost Court. Thus, it is claimed, a Federal question is presented, and the highest court of the State having decided against the immunity claimed, our jurisdiction is invoked.
Assuming that the case is thus brought within our right to review it, the controlling question is whether the commanding general of- the army which captured New Orleans and held it in May, 1862, had authority after the capture of the city to establish á court and appoint a judge with power to try and adjudicate civil causes. Did the Constitution of *295 the United States prevent the creation of civil courts in captured districts during the war of the rebellion, and their creation by military authority?
This cannot be said to be an open question. The subject came under consideration by this court in The Grapeshot,* where it was decided that when, during the late civil war, portions of the insurgent territory were occupied by the Natioual forces, it was within the constitutional authority of the President, as commander in chief, to establish therein provisional courts for the hearing and determination of all causes arising under the laws of the State or of the United States, and it was ruled that a court instituted by President Lincoln for the State of Louisiana, with authority to hear, try, and determine civil causes, was lawfully authorized to exercise such jurisdiction. Its establishment by military authority was held to be no violation of the constitutional provision that “ the judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as the Congress may from time to time ordain and establish.” That clause of the Constitution has no application to the abnormal condition of conquered territory in the occupancy of the conquering army. It refers only to courts of the United States, which military courts are not. As was said in the opinion of the court, delivered by Chief Justice Chase, in The Grapeshot, “ It became the duty of the National government, wherever the insurgeut power was overthrown, and the territory which had been dominated by it was occupied by the National forces, to provide, as far as possible, so long as the war continued, for the security of persons and property and for the administration of justice. The duty of the National government in this respect was no other than that which devolves upon a regular belligerent, occupying during war the territory of another belligerent. It was a military duty, to be performed by the President, as commauder in chief, and intrusted as such with the direction of the military force by which the occupation was held.”
*296 Thus it has been determined that the power to establish by military authority courts for the administration of civil as well as criminal justice in portions of the insurgent States occupied by the National forces, is precisely the same as that which exists when foreign territory has been couquered and is occupied by the conquerors. What that power is has several times been considered. In Leilensdorfer Houghton v. Webb,* may be found a notable illustration. Upon the conquest of New Mexico, in 1846, the commanding officer of the conquering army, in' virtue of the power of conquest and occupancy, and with the sanction and authority of the President, ordained a provisional government for the country.† The ordinance created courts, with both civil and criminal jurisdiction. It did not undertake to change the municipal laws of the territory, but it established a judicial system with a superior or appellate court, and with circuit courts, the jurisdiction of which was declared to embrace, first, all criminal causes that should not otherwise be provided for by law; and secondly, original and exclusive cognizance of all civil cases not cognizable before the prefects and alcaldes. But though these courts and this judicial system were established by the military authority of the United States, without any legislation of Congress, this court ruled that they were lawfully established. And there was no express order for their establishment emanating from the President or the commander in chief The ordinance was the act of General Kearney, the commanding officer of the army occupying the conquered territory.
In view of these decisions it is not to be questioned that the constitution did not prohibit the creation by military authority of courts for the trial of civil causes during the civil war in conquered portions of the insurgent States. The establishment of such courts is but the exercise of the ordinary rights of conquest. The plaintiffs in error, therefore, had no constitutional immunity against subjection to *297 the judgments of such courts. They argue, however, that if this be conceded, still General Butler had no authority to establish such a court; that the President alone, as commander in chief, had such authority. We do not concur in this view. General Butler was in command of the conquering and occupying army. He was commissioned to carry on the war in Louisiana. He was, therefore, invested, with all the powers of making war, except so far as they were denied to him by the commander in chief, and among these powers, as we have seen, was that of establishing courts in conquered territory. It must be presumed that he acted under the orders of his superior officer, the President, and that his acts, in the prosecution of the war, were the acts of his commander in chief.
Again, it is argued that even if the Provost Court was rightly established, it had no jurisdiction over civil causes. It must be conceded that the order by which the court was created did not define expressly the nature and extent of its jurisdiction. And it is also true that a Provost Court ordinarily has cognizance only of minor criminal offences; but that a larger jurisdiction may be given to it, by the power which brings it into being, is undeniable. Whether a larger jurisdiction was conferred in the case now under consideration we are not called upon to determine. It is not a Federal question. The Supreme Court of Louisiana decided that General Butler had a right, after the capture of New Orleans, in May, 1862, to appoint a judge to try civil cases, notwithstanding the provisions of the Constitution. Having determined that he had such a right, we have disposed of the question which entitles the case to be heard Itere, and it is not for us to inquire whether the Provost Court acted within its jurisdiction or not. That is a question exclusively for the State tribunals. Iu determining, as the State Supremo Court did, that the plaintiffs had no such constitutional immunity as they claim, there was no error. If in other respects errors were committed, they are not reviewable by this court, unless they present some other Federal question.
*298 Such a question the plaintiffs allege is presented. Assuming that the judgment given by the Provost Court in favor of the Union Bank was void for want of jurisdiction in the court, they argue that when they paid the sum ad judged against them the law raised an implication of a promise by the Union Bank to refund it, and that the obligation of this contract was impaired by the 149th article of the State constitution of 1868. That article ordained that all judgments and judicial sales, marriages, and executed contracts made in good faith aud in accordance with existing laws in the State, rendered, made, or entered into between the 26th day of January, 1861, and the adoption of the constitution, should bo valid. But if the court was lawfully established, as the Supreme Court of the State decided, the law raised no such promise as is asserted, and the validating clause of the constitution, therefore, impaired no contract obligation. Besides, we cannot admit that the legislation of a State may not validate the judgments of a court in fact, though in giving the judgments the court may have transcended its jurisdiction.
Nothing more need be added. Sufficient has been said to show that, in our opinion, the plaintiffs have been denied no right or immunity secured to them by the Constitution and laws of the United States. If there is any error in the record, it is one of which this court can take no cognizance.
Judgment affirmed.

 9 Wallace, 129.

 20 Howard, 176.

 Executive Documents, 2d session 29th Congress, vol. 3, Document 19.