## MADSEN *v.* KINSELLA, WARDEN.

No. 411.　Argued January 8, 1952.—Decided April 28, 1952.

*Joseph S. Robinson* argued the cause for petitioner. With him on the brief were *Dayton M. Harrington* and *James D. Graham, Jr.*

*Robert W. Ginnane* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney, Beatrice Rosenberg, J. F. Bishop* and *John M. Raymond.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The principal question here is whether a United States Court of the Allied High Commission for Germany had jurisdiction, in 1950, to try a civilian citizen of the United States, who was the dependent wife of a member of the United States Armed Forces, on a charge of murdering her husband in violation of § 211 of the German Criminal

Code.  The homicide occurred in October, 1949, within the United States Area of Control in Germany.  For the reasons hereafter stated, we hold that such court had that jurisdiction.

The present proceeding originates with a petition for a writ of habeas corpus filed by petitioner, Yvette J. Madsen, in the United States District Court for the Southern District of West Virginia, seeking her release from the Federal Reformatory for Women in West Virginia where she is serving a sentence imposed by a United States Court of the Allied High Commission for Germany.  She contends that her confinement is invalid because the court which convicted and sentenced her had no jurisdiction to do so.  The District Court, after a hearing based on exhibits and agreed facts, discharged the writ and remanded petitioner to the custody of the respondent warden of the reformatory.  93 F. Supp. 319.  The Court of Appeals affirmed.  188 F. 2d 272.  Because of the importance and novelty of the jurisdictional issues raised, we granted certiorari.  342 U. S. 865.

I. *Petitioner's status in Germany.*—Petitioner is a native-born citizen of the United States who lawfully entered the American Zone of Occupied Germany in 1947 with her husband, Lieutenant Madsen of the United States Air Force.  In 1949, she resided there, with him, in a house requisitioned for military use, furnished and maintained by military authority.  She was permitted to use the facilities of the United States Army maintained there for persons in its service and for those serving with or accompanying the United States Armed Forces.  In brief, her status was that of a civilian dependent wife of a member of the United States Armed Forces which were then occupying the United States Area of Control in Germany.

October 20, 1949, following her fatal shooting of her husband at their residence at Buchschleg, Kreis Frankfurt, Germany, she was arrested there by the United

States Air Force Military Police. On the following day, before a "United States Military Government Court," [1] she was charged with the murder of her husband in violation of § 211 of the German Criminal Code. [2] In February, 1950, she was tried by "The United States Court of the Allied High Commission for Germany, Fourth Judicial District." [3] That court was composed of three United States civilians, two of whom had been appointed as district judges and one as a magistrate by or under the authority of the Military Governor of the United States Area of Control. [4] The court adjudged her guilty and sen-

---

[1] See United States Military Government Ordinance No. 31, August 18, 1948, 14 Fed. Reg. 124–128. See Appendix, *infra*, p. 365.

[2] The agreed statement of facts states:

"4. Section 211 of the German Criminal Code reads as follows in English translation:

" '*Murder—Mord*

" '211. (*As in force prior to 4 September 1941*). Whoever intentionally kills a human being is guilty of murder if the killing was accomplished with premeditation, and shall be punished by death.

" '211. (*As amended 4 September 1941, RGBI I, 549*). The murderer shall be punished by death.

" 'A murderer is hereby defined as one who kills a human being out of the morbid desire to kill (Mordlust);

" 'For the satisfaction of sexual desire;

" 'For cupidity (Habgier) or any other base motives;

" 'In a treacherous or cruel manner or by means causing common danger, or

" 'In order to make possible or to conceal another offense.

" 'If, in especially exceptional cases, the death penalty is not suitable (angemessen), punishment of confinement for life in a penitentiary shall be imposed.' "

The agreed statement also contains a translation of §§ 44 and 51 of the German Criminal Code providing for reduction of sentence under circumstances which were deemed applicable to petitioner by the trial court.

[3] See Allied High Commission, Law No. 1, Art. 1, December 28, 1949, 15 Fed. Reg. 2086, Appendix, *infra*, pp. 370–371.

[4] See United States Military Government Ordinance No. 31, Art. 13, August 18, 1948, 14 Fed. Reg. 127.

tenced her to 15 years in the Federal Reformatory for Women at Alderson, West Virginia, or elsewhere as the Secretary of the Army might direct. In May, the "Court of Appeals of the United States Courts of the Allied High Commission for Germany," composed of five United States civilians appointed by the Military Governor of the Area,[5] affirmed the judgment but committed her to the custody of the Attorney General of the United States or his authorized representative. The Director of the United States Bureau of Prisons designated the Federal Reformatory for Women at Alderson, West Virginia, as the place for her confinement.[6]

II. *Both United States courts-martial, and United States Military Commissions or tribunals in the nature of such commissions, had jurisdiction in Germany in 1949–1950 to try persons in the status of petitioner on the charge against her.*—Petitioner does not here attack the merits of her conviction nor does she claim that any non-military court of the United States or Germany had jurisdiction to try her.[7] It is agreed by the parties to this proceeding that a regularly convened United States general court-martial would have had jurisdiction to try her. The United States, however, contends, and petitioner denies, that the United States Court of the Allied High Commission for Germany, which tried her, also had jurisdiction

---

[5] See notes 1, 3 and 4, *supra*.

[6] See 38 Stat. 1084–1085, 10 U. S. C. § 1452, and, since May 31, 1951, see Art. 58 of the Uniform Code of Military Justice, 64 Stat. 126, 50 U. S. C. (Supp. IV) § 639.

[7] There was no nonmilitary court of the United States in Germany. She enjoyed the immunity from the jurisdiction of all German courts which had been granted to nationals of the United Nations and to families of members of the occupation forces. United States Military Government Law No. 2, Art. VI (1), 12 Fed. Reg. 2191, 2192, Appendix, *infra*, p. 364; Allied High Commission, Law No. 2, Art. 1, 14 Fed. Reg. 7457, Appendix, *infra*, p. 369; Allied High Commission, Law No. 13, Art. 1, 15 Fed. Reg. 1056–1057, see Appendix, *infra*, p. 370.

to do so. In other words, the United States contends that its courts-martial's jurisdiction was concurrent with that of its occupation courts, whereas petitioner contends that it was exclusive of that of its occupation courts.

The key to the issue is to be found in the history of United States military commissions [8] and of United States occupation courts in the nature of such commissions. Since our nation's earliest days, such commissions have been constitutionally recognized agencies for meeting many urgent governmental responsibilities related to war.[9] They have been called our common-law war

[8] "By a practice dating from 1847 and renewed and firmly established during the Civil War, military commissions have become adopted as authorized tribunals in this country in time of war. They are simply criminal war courts, resorted to for the reason that the jurisdiction of courts-martial, creatures as they are of statute, is restricted by law, and can not be extended to include certain classes of offenses which in war would go unpunished in the absence of a provisional forum for the trial of the offenders. . . . There [Their] competency has been recognized not only in acts of Congress, but in executive proclamations, in rulings of the courts, and in the opinions of the Attorneys General. During the Civil War they were employed in several thousand cases; . . . ." Howland, Digest of Opinions of the Judge-Advocates General of the Army (1912), 1066–1067.

[9] In speaking of the authority and occasion for the use of a military commission, Colonel William Winthrop, in his authoritative work on Military Law and Precedents (2d ed. 1920 reprint), says at 831: ". . . it is those provisions of the Constitution which empower Congress to 'declare war' and 'raise armies,' and which, in authorizing the initiation of *war*, authorize the employment of all necessary and proper agencies for its due prosecution, from which this tribunal derives its original sanction. Its authority is thus the same as the authority for the making and waging of war and for the exercise of military government and martial law. The commission is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief in war. In some instances . . . Congress has specifically recognized the military commission as the proper war-court, and in terms provided for the trial thereby of certain offences. In

courts.[10]   They have taken many forms and borne many names.[11]   Neither their procedure nor their jurisdiction has been prescribed by statute.   It has been adapted in

general, however, it has left it to the President, and the military commanders representing him, to employ the commission, as occasion may require, for the investigation and punishment of violations of the laws of war and other offences not cognizable by court-martial.

"The *occasion* for the military commission arises principally from the fact that the jurisdiction of the court-martial proper, in our law, is restricted by statute almost exclusively to members of the military force and to certain specific offences defined in a written code.   It does not extend to many criminal acts, especially of civilians, peculiar to time of war; and for the trial of these a different tribunal is required. . . .   Hence, in our military law, the distinctive name of *military commission* has been adopted for the exclusively war-court, which . . . is essentially a distinct tribunal from the court-martial of the Articles of war."

For text of General Scott's General Order No. 20, as amended by General Order No. 287, September 17, 1847, authorizing the appointment of military commissions in Mexico, see Birkhimer, Military Government and Martial Law (2d ed. rev. 1904), App. I, 581–582.   See also, *Duncan* v. *Kahanamoku,* 327 U. S. 304; *In re Yamashita,* 327 U. S. 1; *Santiago* v. *Nogueras,* 214 U. S. 260; *Neely* v. *Henkel,* 180 U. S. 109; *Mechanics' & Traders' Bank* v. *Union Bank,* 22 Wall. 276, 279 note; *The Grapeshot,* 9 Wall. 129, 132; *Cross* v. *Harrison,* 16 How. 164, 190; II Halleck, International Law (3d ed. 1893), 444–445.   For an example of the exercise of jurisdiction in a murder case by a Provisional Court established in Louisiana, in 1862, by executive order of the President of the United States and an opinion by the Provisional Judge reviewing the constitutional authority for the establishment of his court, see *United States* v. *Reiter,* 27 Fed. Cas. No. 16,146.

[10] While explaining a proposed reference to military commissions in Article of War 15, Judge Advocate General Crowder, in 1916, said, "A military commission is our common-law war court.   It has no statutory existence, though it is recognized by statute law."   S. Rep. No. 130, 64th Cong., 1st Sess. 40.

[11] Such as Military Commission, Council of War, Military Tribunal, Military Government Court, Provisional Court, Provost Court, Court of Conciliation, Arbitrator, Superior Court, and Appellate Court. And see Winthrop, *op. cit.* 803–804.

each instance to the need that called it forth.    See *In re Yamashita,* 327 U. S. 1, 18–23.

In the absence of attempts by Congress to limit the President's power, it appears that, as Commander-in-Chief of the Army and Navy of the United States, he may, in time of war, establish and prescribe the jurisdiction and procedure of military commissions, and of tribunals in the nature of such commissions, in territory occupied by Armed Forces of the United States.    His authority to do this sometimes survives cessation of hostilities.[12] The President has the urgent and infinite responsibility not only of combating the enemy but of governing any territory occupied by the United States by force of arms.[13] The policy of Congress to refrain from legislating in this

---

[12] It has been recognized, even after peace has been declared, pending complete establishment of civil government.    See *Duncan* v. *Kahanamoku,* 327 U. S. 304; *In re Yamashita,* 327 U. S. 1, 12–13; *Santiago* v. *Nogueras,* 214 U. S. 260; *Neely* v. *Henkel,* 180 U. S. 109; *Burke* v. *Miltenberger,* 19 Wall. 519; *Leitensdorfer* v. *Webb,* 20 How. 176; *Cross* v. *Harrison,* 16 How. 164.

[13] See Article 43 of The Hague Regulations respecting the laws and customs of war on land with special relation to military authority over the territory of a hostile state (1907):

"The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country."    36 Stat. 2306.

"Military government . . . is an exercise of sovereignty, and as such dominates the country which is its theatre in all the branches of administration.    Whether administered by officers of the army of the belligerent, or by civilians left in office or appointed by him for the purpose, it is the government of and for all the inhabitants, native or foreign, wholly superseding the local law and civil authority except in so far as the same may be permitted by him to subsist. . . . The local laws and ordinances may be left in force, and in general should be, subject however to their being in whole or in part suspended and others substituted in their stead—in the discretion of the governing authority."    Winthrop, *op. cit.* 800.

uncharted area does not imply its lack of power to legislate. That evident restraint contrasts with its traditional readiness to "make Rules for the Government and Regulation of the land and naval Forces; . . . ." [14] Under that clause Congress has enacted and repeatedly revised the Articles of War which have prescribed, with particularity, the jurisdiction and procedure of United States courts-martial.

Originally Congress gave to courts-martial jurisdiction over only members of the Armed Forces and civilians rendering functional service to the Armed Forces in camp or in the field.[15] Similarly the Articles of War at first dealt with nonmilitary crimes only by surrendering the accused to the civil authorities. Art. 33, American Articles of War of 1806, Winthrop's Military Law and Precedents (2d ed. 1920 reprint) 979. However, in 1863, this latter jurisdiction was enlarged to include many crimes "committed by persons who are in the military service of the United States . . . ." [16] Still it did not cover crimes committed by civilians who, like petitioner, were merely accompanying a member of the Armed Forces.

---

[14] U. S. Const., Art. I, § 8, cl. 14.

[15] Article XXXII of the American Articles of War of 1775 was taken from Article XXIII of Section XIV of the British Articles of War of 1765. It provided only that "All *suttlers and retailers* to a camp, and all persons whatsoever, *serving with the continental army in the field,* though not inlisted soldiers, are to be subject to the articles, rules, and regulations of the continental army." (Emphasis supplied.) Winthrop's Military Law and Precedents (2d ed. 1920 reprint) 956, and see 941 and 950. Article 60 of the Articles of War of 1806 was similar. It substituted "retainers" for "retailers." *Id.,* at 981. Article 60 was slightly amended in 1874. By 1916, as Article 63, Congress still provided, as to civilians, merely that *"All retainers to the camp,* and all persons *serving with* the armies of the United States *in the field,* though not enlisted soldiers, are to be subject to orders, according to the rules and discipline of war." (Emphasis supplied.) *Id.,* at 991, and see 98–99.

[16] The Enrollment Act of 1863 conferred upon courts-martial jurisdiction over many nonmilitary crimes if committed by soldiers in

Finally, in 1916, when Congress did revise the Articles of War so as to extend the jurisdiction of courts-martial to include civilian offenders in the status of petitioner, it expressly preserved to "military commissions, provost courts, or other military tribunals" all of their existing concurrent jurisdiction by adding a new Article which read in part as follows:

"II. COURTS-MARTIAL.

•           •           •           •           •

"C. JURISDICTION.

•           •           •           •           •

"ART. 15. NOT EXCLUSIVE.—The provisions of these articles conferring jurisdiction upon courts-martial

---

time of war. That Act incidentally recognized a concurrent jurisdiction over such crimes in military commissions:

"SEC. 30. . . . in time of war, insurrection, or rebellion, murder, assault and battery with an intent to kill, manslaughter . . . shall be *punishable by the sentence of a general court-martial or military commission, when committed by persons who are in the military service of the United States, and subject to the articles of war;* and the punishments for such offences shall never be less than those inflicted by the laws of the state, territory, or district in which they may have been committed." (Emphasis supplied.)   12 Stat. 736.

In the codification published as the Revised Statutes of 1874, the incidental reference to military commissions was omitted. Article of War 58 at 234. Petitioner attaches substantial significance to the omission. It seems clear, however, that regardless of what effect, if any, may attach to that omission in its relation to the jurisdiction of military commissions over persons *in* the military service, it has no effect on the jurisdiction of military commissions over *civilians not "in* the military service." This section of the Act of 1863 was enacted so as to place soldiers who committed certain nonmilitary crimes under the jurisdiction of military courts. See *Caldwell* v. *Parker,* 252 U. S. 376. The section did not relate to the jurisdiction of courts or commissions over civilians not *in* the military service. Cong. Globe, 37th Cong., 3d Sess. 988, 1256, 1377, 1384 (1863). For discussion of the phrase "in the military service" as used in Articles 58 and 60, see Gen. Crowder's testimony. S. Rep. No. 229, 63d Cong., 2d Sess. 104.

shall not be construed as depriving military commissions, provost courts, or other military tribunals of concurrent jurisdiction in respect of offenders or offenses that by the law of war may be lawfully triable by such military commissions, provost courts, or other military tribunals." 39 Stat. 651, 652, 653.[17]

Article 15 thus forestalled precisely the contention now being made by petitioner. That contention is that certain provisions, added in 1916 by Articles 2 and 12 extending the jurisdiction of courts-martial over civilian offenders and over certain nonmilitary offenses, auto-

---

[17] In 1920, Article of War 15 was reenacted with the addition of "by statute or" before the words "by the law of war." 41 Stat. 790, 10 U. S. C. § 1486. It was in that form in 1949 and 1950. It was again reenacted May 5, 1950, as the present Article 21 of the Uniform Code of Military Justice, effective May 31, 1951. 64 Stat. 115, 145, 50 U. S. C. (Supp. IV) § 581. The hearings, in 1949, on the latter legislation are of some significance here. They disclosed that the United States Military Government Courts in Germany were then exercising, in the occupied territory, criminal jurisdiction over United States civilians accompanying the Armed Forces. Attention even was called to the recent case of Wilma B. Ybarbo. Like petitioner in the instant case, she was a civilian dependent wife of a member of the United States Armed Forces in Germany, charged with the murder of her husband in violation of the German Criminal Code. She was convicted by the United States Military Government Court for the Third Judicial District. The Court of Appeals of the United States Military Government Courts, March 14, 1949, upheld her conviction, on a lesser charge, and sentenced her to five years' imprisonment. In its opinion, the latter court reviewed the basis for its jurisdiction. *United States Military Government* v. *Ybarbo,* 1 U. S. M. G. Court of Appeals 207. See also, Hearings before a Subcommittee of the House Committee on Armed Services on H. R. 2498, Uniform Code of Military Justice, 81st Cong., 1st Sess. 876, 975, 1061. With this practice before them, the Committees of both Houses of Congress recommended the reenactment of Article of War 15 as Article 21 of the new code. They said, "This article preserves existing Army and Air Force law which gives concurrent jurisdiction to military tribunals other than courts martial." S. Rep. No. 486, 81st Cong., 1st Sess. 13; H. R. Rep. No. 491, 81st Cong., 1st Sess. 17.

matically deprived military commissions and other military tribunals of whatever existing jurisdiction they then had over such offenders and offenses. Articles 2 and 12, together, extended the jurisdiction of courts-martial so as to include "all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States . . . ."[18]  The 1916 Act also increased the nonmilitary offenses for which civilian offenders could be tried by courts-martial.[19]  Article 15, however, completely disposes of that contention.  It states unequivocally that Congress has not deprived such commissions or tribunals of the existing jurisdiction which they had over such offenders and offenses as of August 29, 1916.  39 Stat. 653, 670.  See *In re Yamashita,* 327 U. S. 1, and *Ex parte Quirin,* 317 U. S. 1.

---

[18] The 1916 Act substituted, for Article 63 (see note 15, *supra*), a new Article 12 which provided that *"General courts-martial shall have power to try any person subject to military law* for any crime or offense made punishable by these articles, and any other person who by the law of war is subject to trial by military tribunals: . . . ." (Emphasis supplied.)  39 Stat. 652, 41 Stat. 789, 62 Stat. 629, 10 U. S. C. (Supp. IV) § 1483.  A new Article 2 then defined *"any person subject to military law"* so as to include—

"(d) All retainers to the camp and *all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States,* and in time of war all such retainers and persons accompanying or serving with the armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles; . . . ."  (Emphasis supplied.)  39 Stat. 651, 41 Stat. 787, 10 U. S. C. § 1473 (d).

[19] In 1916, new Articles 92 and 93 expanded the jurisdiction of courts-martial over murder and certain other nonmilitary crimes so as to cover their commission by any "person subject to military law." That phrase, through Article 2, included civilians in the status of petitioner.  See note 18, *supra*.  For Articles 92 and 93, see 39 Stat. 664, 41 Stat. 805, 62 Stat. 640, 10 U. S. C. (Supp. IV) §§ 1564, 1565. See note 16, *supra*, for the substance of Article 30 of the Articles of War of 1863 and of Article 58 of the Articles of War of 1874.

The legislative history strengthens the Government's position. During the consideration by Congress of the proposed Articles of War, in 1916, Judge Advocate General of the Army Crowder sponsored Article 15 and the authoritative nature of his testimony has been recognized by this Court. *In re Yamashita, supra,* at 19 note, 67–71. Before the Senate Subcommittee on Military Affairs he said:

> "Article 15 is new. We have included in article 2 as subject to military law a number of persons who are also subject to trial by military commission. A military commission is our common-law war court. It has no statutory existence, though it is recognized by statute law. As long as the articles embraced them in the designation 'persons subject to military law,' and provided that they might be tried by court-martial, I was afraid that, having made a special provision for their trial by court-martial, it might be held that the provision operated to exclude trials by military commission and other war courts; so this new article was introduced: . . . ."

> "It just saves to these war courts the jurisdiction they now have and makes it a concurrent jurisdiction with courts-martial, so that the military commander in the field in time of war will be at liberty to employ either form of court that happens to be convenient." S. Rep. No. 130, 64th Cong., 1st Sess. 40.[20]

---

[20] In explaining like provisions to the House Committee on Military Affairs in 1912, General Crowder previously had said:

"The next article, No. 15, is entirely new, and the reasons for its insertion in the code are these: In our War with Mexico two war courts were brought into existence by orders of Gen. Scott, viz, the military commission and the council of war. By the military commission Gen. Scott tried cases cognizable in time of peace by civil courts, and by the council of war he tried offenses against the laws of war. The council of war did not survive the Mexican War period, and in our subsequent wars its jurisdiction has been taken over by the

The concurrent jurisdiction thus preserved is that which "by statute or *by the law of war* may be triable by such military commissions, provost courts, or other military tribunals." (Emphasis supplied.) 39 Stat. 653, 41 Stat. 790, 10 U. S. C. § 1486. The "law of war" in that connection includes at least that part of the law of nations which defines the powers and duties of belligerent powers occupying enemy territory pending the establishment of

---

military commission, which during the Civil War period tried more than 2,000 cases. While the military commission has not been formally authorized by statute, its jurisdiction as a war court has been upheld by the Supreme Court of the United States. It is an institution of the greatest importance in a period of war and should be preserved. In the new code the jurisdiction of courts-martial has been somewhat amplified by the introduction of the phrase 'Persons subject to military law.' There will be more instances in the future than in the past when the jurisdiction of courts-martial will overlap that of the war courts, and the question would arise whether Congress having vested jurisdiction by statute the common law of war jurisdiction was not ousted. I wish to make it perfectly plain by the new article that in such cases the jurisdiction of the war court is concurrent.

.          .          .          .          .

". . . I was influenced to propose the article [15] largely, perhaps, by experience during our second intervention in Cuba. It was not very long after that intervention had been inaugurated until two soldiers were charged with homicide of some natives. There was no civil court of the United States having jurisdiction. Plainly the court-martial could not try them, as the condition was not war. There were two courses open: First, to surrender them for trial before a Cuban court . . . the second course was to utilize the extraordinary authority which inhered in the office of the provisional governor and which extended to the making of laws, to promulgate a special decree creating a provisional court for the trial of these men. This second course was followed, and the accused soldiers were tried by a court composed of officers of the Army, which administered the provisions of the Spanish criminal code. Should we be confronted again with the necessity of intervention, that situation is likely to repeat itself." S. Rep. No. 229, 63d Cong., 2d Sess. 53, 98–99.

civil government.[21] The jurisdiction exercised by our military commissions in the examples previously mentioned extended to nonmilitary crimes, such as murder and other crimes of violence, which the United States as the occupying power felt it necessary to suppress. In the case of *In re Yamashita*, 327 U. S. 1, 20, following a quotation from Article 15, this Court said, "By thus recognizing military commissions in order to preserve their traditional jurisdiction over enemy combatants unimpaired by the Articles, Congress gave sanction, as we held in *Ex parte Quirin*, to any use of the military commission contemplated by the common law of war." [22] The enlarged jurisdiction of the courts-martial therefore did not exclude the concurrent jurisdiction of military commissions and of tribunals in the nature of such commissions.

---

[21] See note 9, *supra*.

[22] In *Ex parte Quirin*, 317 U. S. 1, 28, this Court said:

"By the Articles of War, and especially Article 15, Congress has explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war in appropriate cases. Congress, in addition to making rules for the government of our Armed Forces, has thus exercised its authority to define and punish offenses against the law of nations by sanctioning, within constitutional limitations, the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals. And the President, as Commander in Chief, by his Proclamation in time of war has invoked that law. By his Order creating the present Commission he has undertaken to exercise the authority conferred upon him by Congress, and also such authority as the Constitution itself gives the Commander in Chief, to direct the performance of those functions which may constitutionally be performed by the military arm of the nation in time of war."

In that case the military commission's conviction of saboteurs, including one citizen of the United States, was upheld on charges of violating the law of war as defined by statute. *Id.*, at 35–38.

III. *The United States Courts of the Allied High Commission for Germany were, at the time of the trial of petitioner's case, tribunals in the nature of military commissions conforming to the Constitution and laws of the United States.*—Under the authority of the President as Commander-in-Chief of the United States Armed Forces occupying a certain area of Germany conquered by the allies, the system of occupation courts now before us developed gradually. The occupation courts in Germany are designed especially to meet the needs of law enforcement in that occupied territory in relation to civilians and to nonmilitary offenses. Those courts have been directed to apply the German Criminal Code largely as it was theretofore in force. (See Appendix, *infra,* pp. 362–371, entitled "Chronology of Establishment of United States Military Government Courts and Their Jurisdiction Over Civilians in the United States Area of Control in Germany 1945–1950.") The President, as Commander-in-Chief of the Army and Navy, in 1945 established, through the Commanding General of the United States Forces in the European Theater, a United States Military Government for Germany within the United States Area of Control. Military Government Courts, in the nature of military commissions, were then a part of the Military Government. By October 20, 1949, when petitioner was alleged to have committed the offense charged against her, those courts were known as United States Military Government Courts. They were vested with jurisdiction to enforce the German Criminal Code in relation to civilians in petitioner's status in the area where the homicide occurred.

September 21, 1949, the occupation statute had taken effect. Under it the President vested the authority of the United States Military Government in a civilian acting as the United States High Commissioner for Germany. He gave that Commissioner "authority, under the immediate supervision of the Secretary of State (sub-

ject, however, to consultation with and ultimate direction by the President), to exercise all of the governmental functions of the United States in Germany (other than the command of troops) . . . ." Executive Order 10062, June 6, 1949, 14 Fed. Reg. 2965, Appendix, *infra,* p. 367; Office of the United States High Commissioner for Germany, Staff Announcement No. 1, September 21, 1949, Appendix, *infra,* p. 368. Under the Transitional Provisions of Allied High Commission, Law No. 3, Article 5, 14 Fed. Reg. 7458, Appendix, *infra,* p. 369, preexisting legislation was applied to the appropriate new authorities. Finally by Allied High Commission, Law No. 1, Article 1, 15 Fed. Reg. 2086, Appendix, *infra,* p. 370, effective January 1, 1950, the name of the "United States Military Government Courts for Germany" was changed to "United States Courts of the Allied High Commission for Germany." They derived their authority from the President as occupation courts, or tribunals in the nature of military commissions, in areas still occupied by United States troops. Although the local government was no longer a "Military Government," it was a government prescribed by an occupying power and it depended upon the continuing military occupancy of the territory.

The government of the occupied area thus passed merely from the control of the United States Department of Defense to that of the United States Department of State. The military functions continued to be important and were administered under the direction of the Commander of the United States Armed Forces in Germany. He remained under orders to take the necessary measures, on request of the United States High Commissioner, for the maintenance of law and order and to take such other action as might be required to support the policy of the United States in Germany. Executive Order 10062, *supra.*

The judges who served on the occupation courts were civilians, appointed by the United States Military Governor for Germany, and thereafter continued in office or appointed by the United States High Commissioner for Germany. Their constitutional authority continued to stem from the President. The members of the trial court were designated by the Chief Presiding District Judge as a panel to try the case. The volume of business, the size of the area, the number of civilians affected, the duration of the occupation and the need for establishing confidence in civilian procedure emphasized the propriety of tribunals of a nonmilitary character.[23] With this purpose, the Military Government Courts for Germany, substantially from their establishment, have had a less military character than that of courts-martial.[24] In 1948, provi-

---

[23] The Government estimates that the United States Area of Control has a German population of about 17,000,000, plus United Nations nationals, including refugees. As of November 30, 1949, it estimates that there were in Germany about 34,000 dependents of members of United States Armed Forces, plus 4,700 civilian employees with 5,000 dependents. Other United States agencies had 4,100 employees in Germany. The occupation courts have been handling at least 1,000 criminal cases a month, including from 25 to 30 cases involving American civilians. See also, general account of the development of the Military Government Courts in Clay, Decision in Germany (1950), 246–248.

[24] United States Military Government Ordinance No. 2, in 1946, provided—

"(e) *Article V; rights of accused.* (1) Every person accused before a Military Government Court shall be entitled:

"(i) To have in advance of trial a copy of the charges upon which he is to be tried;

"(ii) To be present at his trial, to give evidence and to examine or cross-examine any witness; but the court may proceed in the absence of the accused if the accused has applied for and been granted permission to be absent, or if the accused is believed to be a fugitive from justice;

"(iii) To consult a lawyer before trial and to conduct his own defense or to be represented at the trial by a lawyer of his own

sion was made for the appointment of civilian judges with substantial legal experience. The rights of individuals were safeguarded by a code of criminal procedure dealing with warrants, summons, preliminary hearings, trials, evidence, witnesses, findings, sentences, contempt, review of cases and appeals.[25] This subjected German and United

choice, subject to the right of the court to debar any person from appearing before the court;

"(iv) In any case in which a sentence of death may be imposed, to be represented by an officer of the Allied Forces, if he is not otherwise represented;

"(v) To bring with him to his trial such material witnesses in his defense as he may wish, or to have them summoned by the court at his request, if practicable;

"(vi) To apply to the court for an adjournment where necessary to enable him to prepare his defense;

"(vii) To have the proceedings translated, when he is otherwise unable to understand the language in which they are conducted; . . . ." 12 Fed. Reg. 2191.

[25] United States Military Government Ordinances 32 and 33, code of criminal procedure for United States Military Government Courts for Germany, 14 Fed. Reg. 128–133.

Field Manual 27–5 (1947), at page 66, provides:

"Military government tribunals are not governed by the provisions of the Manual for Courts-Martial nor by the limitations imposed on courts-martial by Articles of War. Experience has demonstrated that in administering justice in an occupied area, it is desirable to follow forms of judicial procedure which are generally similar to the forms of procedure to which the people are accustomed."

Cf. the order of President Lincoln of October 20, 1862, establishing a Provisional Court in New Orleans, Louisiana, as a "court of record for the State of Louisiana" with a civilian as—

"a provisional judge, to hold said court, with authority to hear, try, and determine all causes, civil and criminal, including causes in law, equity, revenue, and admiralty, and particularly all such powers and jurisdiction as belong to the District and Circuit courts of the United States, *conforming his proceedings, so far as possible, to the course of proceedings and practice which has been customary in the courts of the United States in Louisiana;* his judgments to be final and conclusive. . . . These appointments [of prosecuting attorney, marshal

States civilians to the same procedures and exhibited confidence in the fairness of those procedures.[26]

It is suggested that, because the occupation statute took effect September 21, 1949, whereas the crime charged occurred October 20, 1949, the constitutional authority for petitioner's trial by military commission expired before the crime took place. Such is not the case. The authority for such commissions does not necessarily expire upon cessation of hostilities or even, for all purposes, with a treaty of peace. It may continue long enough to permit the occupying power to discharge its responsibilities fully. *Santiago* v. *Nogueras,* 214 U. S. 260; *Neely* v. *Henkel,* 180 U. S. 109, 124; *Burke* v. *Miltenberger,* 19 Wall. 519; *Leitensdorfer* v. *Webb,* 20 How. 176; *Cross* v. *Harrison,* 16 How. 164.[27]

IV. *Petitioner and the offense charged against her came within the jurisdiction assigned to the court which tried her.*—Under United States Military Government Ordi-

and clerk of the court] are to continue during the pleasure of the President, not extending beyond the military occupation of the city of New Orleans, or the restoration of the civil authority in that city and the State of Louisiana." (Emphasis supplied.) *Mechanics' & Traders' Bank* v. *Union Bank,* 22 Wall. 276, 279 note; and see *United States* v. *Reiter,* 27 Fed. Cas. No. 16,146.

[26] They did not provide for juries. The presentment or indictment of a grand jury required in a federal capital case by the Fifth Amendment to the Constitution of the United States, under the terms of that Amendment, has no application to "cases arising in the land or naval forces . . . ." The right of trial by jury required in federal criminal prosecutions by the Sixth Amendment is similarly limited. See *Ex parte Quirin,* 317 U. S. 1, 40, 43–45; *Ex parte Milligan,* 4 Wall. 2, 123, 138.

[27] ". . . The status of military government continues from the inception of the actual occupation till the invader is expelled by force of arms, or himself abandons his conquest, or till, under a treaty of peace, the country is restored to its original allegiance or becomes incorporated with the domain of the prevailing belligerent." Winthrop, *op. cit.* 801.

nance No. 31, August 18, 1948, Article 7, 14 Fed. Reg. 126, Appendix, *infra*, p. 365, the United States gave its Military Government District Courts "criminal jurisdiction over all persons in the United States Area of Control except persons, other than civilians, who are subject to military, naval or air force law and are serving with any forces of the United Nations." It thus excepted from the jurisdiction of those occupation courts military men and women who were subject to military law but expressly gave those courts jurisdiction over *civilian* men and women who were subject to military law. Article of War 2 (d) further defined "any person subject to military law" as including "all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States . . . ."[28] This included petitioner.

Article 7 of United States Military Government Ordinance No. 31 further provided, however, that "No person subject to military law of the United States shall be brought to trial for any offense except upon authorization of the Commander-in-Chief, European Command." 14 Fed. Reg. 126, Appendix, *infra*, p. 365. That authorization appears in the official correspondence relating to the case of Wilma B. Ybarbo. The correspondence includes a written endorsement from the proper authority, dated December 11, 1948, covering not only the *Ybarbo* case but also the case "of any dependent of a member of the United States Armed Forces . . . ." See Appendix, *infra*, p. 367.

The applicability of the German Criminal Code to petitioner's offense springs from its express adoption by the United States Military Government. The United States Commanding General, in his Proclamation No. 2, September 19, 1945, stated that, except as abrogated, suspended or modified by the Military Government or by the Control

---

[28] See note 18, *supra*.

Council for Germany, "the German law in force at the time of the occupation shall be applicable in each area of the United States Zone of Occupation . . . ." 12 Fed. Reg. 6997, Appendix, *infra,* p. 363.[29] Section 211 of the German Criminal Code accordingly was applicable to petitioner on October 20, 1949. The United States also expressly required that its civilians be tried by its occupation courts rather than by the German courts. United States Military Government Law No. 2, German courts, Art. VI (i)(c) and (d), 12 Fed. Reg. 2191, 2192, Appendix, *infra,* p. 364. United States Military Government Ordinance No. 2, Art. II (2)(iii), 12 Fed. Reg. 2190–2191, Appendix, *infra,* p. 363.

The jurisdiction of the United States Courts of the Allied High Commission for Germany to try petitioner being established, the judgment of the Court of Appeals affirming the discharge of the writ of habeas corpus for petitioner's release from custody is

*Affirmed.*

APPENDIX TO OPINION OF THE COURT.

Chronology of Establishment of United States Military Government Courts and Their Jurisdiction Over Civilians in the United States Area of Control in Germany 1945–1950.

(*Emphasis supplied throughout except in headings.*)

1. *June 5, 1945.*—Allied Powers assumed "supreme authority with respect to Germany, including all the powers possessed by the German Government, the High Command and any state, municipal, or local government or authority. The assumption, for the purposes stated

---

[29] Cf. *Dow* v. *Johnson,* 100 U. S. 158, 166; *Ketchum* v. *Buckley,* 99 U. S. 188, as illustrations of the practice of recognizing the existing law of the occupied area; and Winthrop, *op. cit.* 800.

above, of the said authority and powers does not effect the annexation of Germany." Declaration by Commanding Generals representing the United States, the Soviet Union, Great Britain and the French Provisional Government, THE AXIS IN DEFEAT—A Collection of Documents on American Policy Toward Germany and Japan, published by the United States Department of State, p. 63.

2. *July 14, 1945.*—Commanding General, United States Armed Forces in Europe, established a Military Government under his authority in the United States Zone of Occupation—Military Government—United States Area of Control, Proclamation No. 1, 12 Fed. Reg. 6997.

3. *September 19, 1945.*—Commanding General, United States Forces, European Theater, proclaimed:

> *"Article II.* Except as heretofore abrogated, suspended or modified by Military Government or by the Control Council for Germany, the German law in force at the time of the occupation shall be applicable in each area of the United States Zone of Occupation, until repealed by, or superseded by a new law enacted by the Control Council for Germany, or by Military Government or the states hereby constituted or by other competent authority." Military Government—United States Area of Control, Proclamation No. 2, 12 Fed. Reg. 6997.

4. *1946.*—Military Government Courts, as distinguished from courts-martial, were given jurisdiction over all persons in the occupied territory, including *civilians subject to military law* and over offenses under the laws of the occupied territory.

> *". . . Article II; jurisdiction.* (1) Military Government courts shall have jurisdiction *over all persons in the occupied territory except persons other than civilians who are subject to military, naval or air force law* and are serving under the command

of the Supreme Commander, Allied Expeditionary Force, or any other Commander of any forces of the United Nations.

"(2) *Military Government Courts shall have jurisdiction over:*

"(i) All offences against the laws and usages of war.

"(ii) All offences under any proclamation, law, ordinance, notice or order issued by or under the authority of the Military Government or of the Allied Forces.

"(iii) *All offences under the laws of the occupied territory or of any part thereof.*" United States Military Government Ordinance No. 2, Military Government Courts, 12 Fed. Reg. 2190–2191.

5. *1946.*—German courts were denied jurisdiction in certain criminal cases, including those involving any national of the United Nations or any dependent accompanying any of the Armed Forces of any of the United Nations.

". . . *Article VI; limitations on jurisdiction.* (1) Except when expressly authorized by Control Council or Military Government Law, ordinance or regulation, or by order of the Director of Military Government of the appropriate Land, no German court shall assert or exercise jurisdiction in the following cases or classes or [of] cases:

"(i) Criminal cases involving:

"(*a*) Any of the United Nations, or

"(*b*) The Armed Forces of any of the United Nations, or

"(*c*) *Any person serving with any such Forces or a dependent accompanying any of them,* or

"(*d*) *Any national of the United Nations,* or . . . ." United States Military Government, Law No. 2, German courts, 12 Fed. Reg. 2191, 2192.

6. *August 18, 1948.*—United States Military Government Courts for Germany established.

"... *Ordinance No. 31; United States Military Government Courts for Germany; creation of the courts*—(a) *Article 1; judicial system.* A system of courts is hereby established for the United States Area of Control of Germany . . . .

. . . . .

"(c) *Article 3; District Courts.* (1) A District Court is hereby established for each judicial district within the United States Area of Control.

. . . . .

"(3) Each District Court shall consist of one or more District Judges and one or more Magistrates who shall sit singly except as provided in subparagraph (5) of this paragraph.

. . . . .

"(5) A District Court composed of three District Judges or two District Judges and a Magistrate may hear and decide any civil or criminal case, and, in the latter, may impose any lawful sentence including death. A majority of such Court shall decide any case before it, provided that no sentence of death shall be imposed except by the unanimous decision of the Court.

. . . . .

"(8) *Where an accused is charged with an offense under German law, the Court shall be limited to the sentence or other penal provision of such law.*

. . . . .

"JURISDICTION OF THE COURTS

"(g) *Article 7, jurisdiction of District Courts in criminal cases.* (1) District Courts shall have crim-

inal jurisdiction over all persons in the United States Area of Control except persons, other than civilians, who are subject to military, naval or air force law and are serving with any forces of the United Nations. *No person subject to military law of the United States shall be brought to trial for any offense except upon authorization of the Commander-in-Chief, European Command.* No member of an Allied Mission, visiting governmental official, or person subject to the military law of any country other than the United States, shall be brought to trial for any offense except upon authorization of the Military Governor.

"(2) *District Courts shall have jurisdiction to hear and decide cases involving:*

"(i) Offenses under legislation issued by or under the authority of the Allied Control Council;

"(ii) Offenses under United States Military Government Legislation;

"(iii) *Offenses under German law in force in the Judicial District of the Court.*" 14 Fed. Reg. 124, 125, 126.

7. *December 11, 1948.*—The Commander-in-Chief of the United States European Command endorsement addressed to the Chief Attorney, United States Military Government Courts for Germany:

"Authorization is hereby given for trial of any dependent of a member of the United States Armed Forces or of any dependent of a civilian employee of the Department of the Army for any non-military offenses before the appropriate Military Government Court established by Military Government Ordinance No. 31 unless, in a particular case, this headquarters has directed trial by Court Martial." Resp. Ex. 4, R. 71.

8. *May 12, 1949.*—Occupation statute promulgated by Military Governors and Commanders-in-Chief of the Western Zones of Germany—to become effective at a later date. It declared that—

"1. During the period in which it is necessary that the occupation continue . . . [the occupying powers] desire and intend that the German people shall enjoy self-government to the maximum possible degree consistent with such occupation. The Federal State and the participating Laender [states] shall have, subject only to the limitations in this Instrument, full legislative, executive and judicial powers in accordance with the Basic Law and with their respective constitutions.

"2. In order to ensure the accomplishment of the basic purposes of the occupation, powers in the following fields are specifically reserved . . . .

.        .        .        .        .

"(e) Protection, prestige, and security of Allied forces, dependents, employees and representatives, their immunities and satisfaction of occupation costs and their other requirements; . . . ."   14 Fed. Reg. 7457.

9. *June 6, 1949.*—Executive Order 10062 of the President Establishing the Position of United States High Commissioner for Germany:

"2. The United States High Commissioner for Germany, hereinafter referred to as the High Commissioner, shall be the supreme United States authority in Germany. The High Commissioner shall have the authority, under the immediate supervision of the Secretary of State (subject, however, to consultation with and ultimate direction by the President), to exercise all of the governmental functions of the United States in Germany (other than the command

of troops), including representation of the United States on the Allied High Commission for Germany when established, and the exercise of appropriate functions of a Chief of Mission within the meaning of the Foreign Service Act of 1946.

.　　　.　　　.　　　.　　　.

"4. In the event that the High Commissioner shall assume his duties in accordance with this Executive Order prior to the date that the Military Government of the United States Zone of Germany is terminated, he shall during such interval report to the Secretary of Defense, through the Secretary of the Army, and shall be the United States Military Governor with all the powers thereof including those vested in the United States Military Governor under all international agreements."　14 Fed. Reg. 2965.

10. *September 21, 1949.*—Council of Allied High Commission declared occupation statute to be in force as promulgated May 12, 1949.　14 Fed. Reg. 7456.

11. *September 21, 1949.*—United States High Commissioner for Germany, in accordance with Executive Order 10062, assumed the authority residing in the United States Military Governor and the Office of Military Government for Germany for the governmental functions of the United States in Germany:

"2. The Office of the U. S. High Commissioner for Germany is hereby established as the agency through which the authority vested in the U. S. High Commissioner shall be exercised.　Its organization shall be as shown in the attached charts [including U. S. High Commission Courts, Court of Appeals, District Courts], and its functions shall be assigned among its constituent elements as set forth in separate issuances, effective this date."　Office of the United States High Commissioner for Germany, Staff Announcement No. 1, Resp. Ex. 1, R. 67, 68.

12. *September 21, 1949.*—The United States High Commissioner for Germany announced that the United States Courts for Germany, as established by Staff Announcement No. 1 (and previously established as the "United States Military Government Courts for Germany," pursuant to United States Military Government Ordinance No. 31) "form an independent judicial unit responsible directly to the United States High Commissioner. The integrated system provides for district judges and magistrates at the district court level and for a Chief Judge and associate judges of the Court of Appeals." Office of the United States High Commissioner for Germany, Staff Announcement No. 5, Resp. Ex. 2, R. 69. Similar announcement was made as to the Office of General Counsel and of the Chief Attorney. Staff Announcement No. 6, Resp. Ex. 3, R. 70.

13. *September 21, 1949.*—"Allied Forces" defined by Allied High Commission:

> "In the absence of any indication to the contrary, in legislation of the Allied High Commission:
>
> .　　.　　.　　.　　.
>
> "3. The expression '*Allied Forces*' shall include—
> "(a) The Occupation Authorities.
> "(b) *The Occupation Forces and their members.*
> "(c) Non-German nationals, civilian or military, who are serving with the Occupation Authorities.
> "(d) *Members of the families* and non-German persons in the service *of the persons referred to in subparagraphs (a) (b) and (c) of this paragraph.*"
> Allied High Commission, Law No. 2, Art. 1, 14 Fed. Reg. 7457.

14. *September 21, 1949.*—Transitional Provisions proclaimed by Allied High Commission for Germany adapting existing legislation to the provisions of the occupation statute effective September 21, 1949.

"ARTICLE 5

"References in any legislation enacted before the entry into force of the Occupation Statute to the Control Council, the Supreme Commander Allied Expeditionary Force, the Commanding General, the Armed Forces, Military Government, the Military Governor and to other authorities shall, where the context so requires or admits, be deemed to refer to the appropriate authorities exercising the particular functions mentioned in such legislation." Allied High Commission, Law No. 3, 14 Fed. Reg. 7458.

15. *November 25, 1949.*—Judicial powers were reserved, from the German courts, as to members of families of members of the Occupation Forces, thus bringing them under the jurisdiction of the occupation courts.

"The Council of the Allied High Commission enacts as follows:

"ARTICLE 1

"Except when expressly authorized, either generally or in specific cases, by the High Commissioner of the Zone in which the Court is located, *German Courts shall not exercise criminal jurisdiction:*
"(a)(i) *Over the Allied Forces;* . . . ." Allied High Commission, Law No. 13, 15 Fed. Reg. 1056.

16. *December 28, 1949 (Effective January 1, 1950).*— Occupation courts were changed.

"The United States High Commissioner for Germany enacts as follows:

"ARTICLE 1

"Article 1 of United States Military Government Ordinance No. 31, 'United States Military Government Courts for Germany', is hereby amended by

changing the last sentence of said Article to read as follows:

" 'The Courts so created shall be known as the *United States Courts of the Allied High Commission for Germany.*' "

## "ARTICLE 2

"Article 4 of United States Military Government Ordinance No. 31, 'United States Military Government Courts for Germany', is hereby amended by changing the first sentence of Section 2 of said Article to read as follows:

" 'The Court of Appeals shall consist of a Chief Justice and eight Associate Justices.' "

## "ARTICLE 3

"Wherever the term 'United States Military Government Courts for Germany' or the terms 'Chief Judge' or 'Associate Judge' or 'Associate Judges' of the Court of Appeals are used in any legislation and regulations now in force, such terms shall be deemed to refer to the *United States Courts of the Allied High Commission for Germany* and the Chief Justice and an Associate Justice or Associate Justices of the Court of Appeals of such Courts, respectively." Allied High Commission, Law No. 1, 15 Fed. Reg. 2086.

MR. JUSTICE BLACK, dissenting.

Petitioner, a United States citizen, is now serving a fifteen-year sentence for murdering her husband. At the time of the alleged crime, she was living in the United States Area of Control in Germany with her husband who was an Air Force lieutenant on active duty in Germany. It appears that the court that tried her and the law she was judged by were not established or authorized by the

Congress. Executive officers acting under presidential authority created the system of courts that tried her, promulgated the edicts she was convicted of violating, and appointed the judges who took away her liberty.

The very first Article of the Constitution begins by saying that "All legislative Powers herein granted shall be vested in a Congress" and no part of the Constitution contains a provision specifically authorizing the President to create courts to try American citizens. Whatever may be the scope of the President's power as Commander in Chief of the fighting armed forces, I think that if American citizens in present-day Germany are to be tried by the American Government, they should be tried under laws passed by Congress and in courts created by Congress under its constitutional authority.