141 F.Supp. 190 (1956)
Matter of the Petition in Behalf of Louis B. VARNEY, Petitioner, For a Writ of Habeas Corpus.
UNITED STATES of America ex rel. Tobias G. KLINGER,
v.
COMMANDANT, UNITED STATES DISCIPLINARY BARRACKS, Lompoc, California, Respondent.
No. 19257.
United States District Court S. D. California, Central Division.
April 27, 1956.
*191 Tobias G. Klinger, Los Angeles, Cal., for petitioner.
Laughlin E. Waters, U. S. Atty., Max F. Deutz & Andrew J. Weisz, Asst. U. S. Attys., Los Angeles, Cal., James W. Booth, Lt. Col. United States Army Judge Advocate General's Corps., Washington, D. C., for respondent.
JAMES M. CARTER, District Judge.
This case raises the question of the right of the military to try in a military court in a foreign country, a civilian employee of the military.
*192 The prisoner, Louis B. Varney, was employed as a Department of the Army civilian on 26 February 1952. Thereafter he was transported by the Army to Japan, where he arrived on 4 March 1952. He was assigned upon arrival to the Engineer Section of the Yokohama Engineer Depot, Maintenance Division, APO 503. His status as a Department of the Army civilian employee accompanying the Army in Japan was not changed, at least until after his trial by general court-martial.
In accordance with the provisions of Article XVII of the Administrative Agreement Under Article III of the Security Treaty Between the United States of America and Japan, the prisoner was brought to trial before an Army general court-martial in Tokyo, Japan, for violation of several Articles of the Uniform Code of Military Justice, 50 U.S.C.A. § 551 et seq. The prisoner was found guilty of violation of a general regulation prohibiting certain commercial activities and violation of a general regulation prohibiting certain importation into Japan, both in violation of Article 92 of the Uniform Code of Military Justice, 50 U.S.C.A. § 686; of two specifications of false statements in support of a claim, in violation of Article 132 of the Uniform Code of Military Justice, 50 U. S.C.A. § 726; and of an attempt to violate a general regulation prohibiting certain importation into Japan, in violation of Article 80 of the Uniform Code of Military Justice, 50 U.S.C.A. § 674. On 10 March 1955 he was sentenced to a fine of $10,000 and confinement at hard labor for one year, and to be further confined at hard labor until the fine is so paid, but not for more than 18 months in addition to the one year. The conviction of a violation of a general regulation prohibiting certain commercial activities was disapproved by the convening authority who approved only so much of the sentence as provided for a fine of $5,000 and confinement at hard labor for six months, and further confinement at hard labor until the fine is paid but not for more than one year in addition to the six months. As thus reduced, the sentence was affirmed by a Board of Review on 27 September 1955.
On 16 November 1955, attorneys for the prisoner filed with the United States Court of Military Appeals a petition for grant of review. That petition questioned the sufficiency of the evidence upon which the prisoner was convicted. It also charged reversible error on the part of the law officer, and misconduct by the trial counsel. On 25 November 1955, counsel for prisoner moved the Court of Military Appeals for leave to file instanter a supplemental assignment of error. The motion was granted by Order of Court, dated 30 November 1955. The supplemental assignment of error raised the precise point now before this Court, that "the court-martial had no jurisdiction to try the accused [prisoner] because he was a civilian." Reply to this supplemental assignment of error was made by Government Appellate Counsel on 15 December 1955.
On 23 December 1955 a petition for writ of habeas corpus was filed in this Court on behalf of the prisoner. An order to show cause and restraining order, directed to the respondent, was issued, with the return date set as 3 January 1956. At that time the matter was continued for hearing until 30 January, with response to the petition to be made by 23 January.
On 17 January 1956, the United States Court of Military Appeals granted the prisoner's petition for review of his case by that Court. In granting the petition, the Court limited briefs and arguments to the questions:
a. Whether the evidence is sufficient to support the findings of guilty on specifications 1 and 2 of Charge II; and
b. Whether the court-martial had jurisdiction to try the prisoner.
Time was fixed for filing of briefs before the Court of Military Appeals.
The writ of habeas corpus proceedings in this Court presents the claim made on behalf of the prisoner that he was deprived of his constitutional right to a jury trial. His petition mentions specifically *193 the Fifth Amendment, and presumably he relies also on the Sixth Amendment and Section 2 of Article III of the Constitution. He is not entitled to the writ for four good reasons, here stated and taken up in order.
First. The prisoner has not exhausted other remedies available to him. In fact, he is at this moment pursuing such remedies within the military appellate system. Those remedies must be exhausted before he may seek habeas corpus.
Second. Persons who occupy a status such as that of the prisoner at the time of his offense and trial have never been entitled to demand a jury trial under the Constitution.
Third. An American citizen who, like the prisoner, goes voluntarily to a foreign country thereby surrenders, for the duration of his stay, the constitutional right to trial by jury.
Fourth. The statute under which court-martial jurisdiction was exercised over the prisoner is a valid exercise of the power granted Congress in Article I, Section 8 of the Constitution "To make Rules for the Government and Regulation of the land and naval Forces," as supplemented by the Necessary and Proper Clause.

I

The prisoner has not exhausted other remedies, which he must do before he may seek habeas corpus.
The respondent's return and answer, and exhibits filed with the Court show the prisoner is even now pursuing remedies available to him within the military appellate court system. On 17 January 1956, the United States Court of Military Appeals agreed to hear the prisoner, not only on the jurisdictional question he raises in this Court, but on other points as well.
The question of exhaustion of remedies, insofar as it affects military habeas corpus cases, was set at rest by the Supreme Court in Gusik v. Schilder, 1950, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146. In that case, the petitioner had sought, and been denied, habeas corpus in the District Court at the time Congress created in the court-martial system the new remedy of petition for a new trial. The Supreme Court held that Gusik had to petition for a new trial before he could proceed on appeal with habeas corpus in the civil courts, even though that particular remedy was not available when his habeas corpus case was heard in the District Court. The reasoning expressed by Mr. Justice Douglas on behalf of a unanimous Court is pertinent. On pages 131-133 of 340 U.S., on page 151 of 71 S.Ct., he said:
"If Article 53 had been in force when the habeas corpus proceedings were instituted, the District Court would not have been justified in entertaining the petition unless the remedy afforded by the Article had first been exhausted. An analogy is a petition for habeas corpus in the federal court challenging the jurisdiction of a state court. If the state procedure provides a remedy, which though available has not been exhausted, the federal courts will not interfere. That is not only the holding of the Court in a long line of cases, see Mooney v. Holohan, 294 U.S. 103, 115, 55 S.Ct. 340, 343, 79 L.Ed. 791; Ex parte Hawk, 321 U.S. 114, 116, 64 S.Ct. 448, 449, 88 L.Ed. 572; it is the rule which Congress recently wrote into the Judicial Code. 28 U.S.C. § 2254, 28 U. S.C.A. § 2254. The policy underlying that rule is as pertinent to the collateral attack of military judgments as it is to collateral attack of judgments rendered in state courts. If an available procedure has not been employed to rectify the alleged error which the federal court is asked to correct, any interference by the federal court may be wholly needless. The procedure established to police the errors of the tribunal whose judgment is challenged may be adequate for the occasion. If it is, any friction between the federal *194 court and the military or state tribunal is saved. That policy is as well served whether the remedy which is available was existent at the time resort was had to the federal courts or was subsequently created, as indeed is implicit in cases from a state court whose review we denied pending exhaustion of a newly created state remedy. See Walker v. Ragen, 338 U.S. 833, 70 S.Ct. 37 [94 L.Ed. 507]; Marks v. Ragen, 339 U.S. 926, 70 S.Ct. 613 [94 L.Ed. 1347]. Such a principle of judicial administration is in no sense a suspension of the writ of habeas corpus. It is merely a deferment of resort to the writ until other corrective procedures are shown to be futile.
* * * * * *
"Petitioner says that resort to Article 53 will be futile. If it proves to be, no rights have been sacrificed. Habeas corpus will then be available to test any questions of jurisdiction which petitioner may offer."
The Court of Appeals for the Ninth Circuit has followed Gusik v. Schilder in Osborne v. Swope, 1955, 226 F.2d 908, affirming the action of the District Court in dismissing a petition for habeas corpus. The Court of Appeals held, on the basis of the Gusik case, that if a petitioner has failed to exhaust available remedies in the military system, he will not be heard on habeas corpus.
Further support for this position is found in the language of the Supreme Court in Burns v. Wilson, 1953, 346 U. S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508. At page 142 of 346 U.S., at page 1048 of 73 S.Ct., the Court said:
"* * * In military habeas corpus cases, even more than in state habeas corpus cases, it would be in disregard of the statutory scheme if the federal civil courts failed to take account of the prior proceedings  of the fair determinations of the military tribunals after all military remedies have been exhausted." (Emphasis supplied.)[1]

II

At the time of his offenses and trial, the prisoner occupied a status which would never have entitled him to demand a jury trial under the Constitution.
There can be no doubt that at the time of his offenses, arrest and trial the prisoner was a civilian, employed by the Army, serving with and accompanying the Army in Japan. In fact, that status is the very basis upon which he now seeks habeas corpus. Thus, he was clearly within the express terms of Article 2(11), Uniform Code of Military Justice, 50 U.S.C.A. § 552, which provides:
"Art. 2. Persons subject to the code.
"The following persons are subject to this code:
* * * * * *
"(11) Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States and without the following territories: That part of Alaska east of longitude one hundred and seventy-two degrees west, the Canal Zone, the main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands". (Emphasis supplied.)
Such employees, "`retainers to the camp'" and "`all persons serving with the armies of the United States in the field'" have been subject to military law since before the Constitution was ordained. See Madsen v. Kinsella, 1952, 343 U.S. 341, 349, 72 S.Ct. 699, 704, 96 L.Ed. 988. Having been subject to military trial at the time the Constitution *195 came into force, such persons were not exempted from that jurisdiction by the Constitution or its later amendments, Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3. Speaking for the eight Court members who participated in consideration of that case, Mr. Chief Justice Stone said, beginning at page 38 of 317 U.S., at page 16 of 63 S.Ct.:
"But petitioners insist that * * their trial is subject to the requirement of the Fifth Amendment that no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury, and that such trials by Article III, § 2, and the Sixth Amendment must be by jury in a civil court. Before the Amendments, § 2 of Article III, the Judiciary Article, had provided: `The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury', and had directed that `such Trial shall be held in the State where the said Crimes shall have been committed'.
"Presentment by a grand jury and trial by a jury of the vicinage where the crime was committed were at the time of the adoption of the Constitution familiar parts of the machinery for criminal trials in the civil courts. But they were procedures unknown to military tribunals, which are not courts in the sense of the Judiciary Article, Ex parte Vallandigham, 1 Wall. 243, 17 L.Ed. 589; In re Vidal, 179 U.S. 126, 21 S.Ct. 48, 45 L.Ed. 118; cf. Williams v. United States, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372, and which in the natural course of events are usually called upon to function under conditions precluding resort to such procedures. As this Court has often recognized, it was not the purpose or effect of § 2 or Article III, read in the light of the common law, to enlarge the then existing right to a jury trial. The object was to preserve unimpaired trial by jury in all those cases in which it had been recognized by the common law and in all cases of a like nature as they might arise in the future, District of Columbia v. Colts, 282 U.S. 63, 51 S.Ct. 52, 75 L.Ed. 177, but not to bring within the sweep of the guaranty those cases in which it was then well understood that a jury trial could not be demanded as of right.
"The Fifth and Sixth Amendments, while guaranteeing the continuance of certain incidents of trial by jury which Article III, § 2 had left unmentioned, did not enlarge the right to jury trial as it had been established by that Article. Callan v. Wilson, 127 U.S. 540, 549, 8 S. Ct. 1301, 1303, 32 L.Ed. 223. Hence petty offenses triable at common law without a jury may be tried without a jury in the federal courts, notwithstanding Article III, § 2, and the Fifth and Sixth Amendments. Schick v. United States, 195 U.S. 65, 24 S.Ct. 826, 49 L.Ed. 99; District of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843. Trial by jury of criminal contempts may constitutionally be dispensed with in the federal courts in those cases in which they could be tried without a jury at common law. Ex parte Terry, 128 U.S. 289, 302, 304, 9 S.Ct. 77, 79, 32 L.Ed. 405; In re Savin, 131 U.S. 267, 277, 9 S.Ct. 699, 701, 33 L.Ed. 150; In re Debs, 158 U.S. 564, 594-596, 15 S.Ct. 900, 910, 911, 39 L.Ed. 1092; United States v. Shipp, 203 U.S. 563, 572, 27 S.Ct. 165, 166, 51 L.Ed. 319; Blackmer v. United States, 284 U.S. 421, 440, 52 S.Ct. 252, 255, 76 L.Ed. 375; Nye v. United States, 313 U.S. 33, 48, 61 S.Ct. 810, 815, 85 L.Ed. 1172; see United States v. Hudson, 7 Cranch 32, 34, 3 L.Ed. 259. Similarly, an action for debt to enforce a penalty inflicted by Congress is not subject to the constitutional restrictions upon criminal prosecutions. United States v. Zucker, 161 U.S. 475, 16 S. *196 Ct. 641, 40 L.Ed. 777; United States v. Regan, 232 U.S. 37, 34 S. Ct. 213, 58 L.Ed. 494, and cases cited.
"All these are instances of offenses committed against the United States, for which a penalty is imposed, but they are not deemed to be within Article III, § 2 or the provisions of the Fifth and Sixth Amendments relating to `crimes' and `criminal prosecutions'. In the light of this long-continued and consistent interpretation we must conclude that § 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts.
"The fact that `cases arising in the land or naval forces' are excepted from the operation of the Amendments does not militate against this conclusion. Such cases are expressly excepted from the Fifth Amendment, and are deemed excepted by implication from the Sixth. Ex parte Milligan, supra, 4 Wall. 123, 138, 139, 18 L.Ed. 281. It is argued that the exception, which excludes from the Amendment cases arising in the armed forces, has also by implication extended its guaranty to all other cases; that since petitioners, not being members of the Armed Forces of the United States, are not within the exception, the Amendment operates to give to them the right to a jury trial. But we think this argument misconceives both the scope of the Amendment and the purpose of the exception.
"We may assume, without deciding, that a trial prosecuted before a military commission created by military authority is not one `arising in the land * * * forces', when the accused is not a member of or associated with those forces. But even so, the exception cannot be taken to affect those trials before military commissions which are neither within the exception nor within the provisions of Article III, § 2, whose guaranty the Amendments did not enlarge. No exception is necessary to exclude from the operation of these provisions cases never deemed to be within their terms. An express exception from Article III, § 2, and from the Fifth and Sixth Amendments, of trials of petty offenses and of criminal contempts has not been found necessary in order to preserve the traditional practice of trying those offenses without a jury. It is no more so in order to continue the practice of trying, before military tribunals without a jury, offenses committed by enemy belligerents against the law of war."
This Supreme Court decision teaches that the right to a trial by jury was not enlarged by the Constitution. The object of the provisions of Section 2, Article III, was to preserve that right unimpaired in all cases in which it was recognized at common law. It did not enlarge the group of those who could demand a jury trial as a matter of right. Nor was the right enlarged by the Fifth and Sixth Amendments. Thus, as Army employees, or "retainers to the camp", were subject to military trial while accompanying the armies in the field prior to the Constitution, they cannot now demand jury trials as a matter of right.

III

Prisoner had no right to trial by jury while voluntarily in a foreign country.
It is established beyond question that the Congress has authority under the Constitution to set up legislative courts in the Executive Department to try United States citizens abroad for offenses committed there, In re Ross, 1891, 140 U.S. 453, 11 S.Ct. 897, 35 L. Ed. 581. Delivering the unanimous *197 opinion of the Court in that case, Mr. Justice Field said, 140 U.S. at page 464, 11 S.Ct. at page 900:
"* * * By the constitution a government is ordained and established `for the United States of America,' and not for countries outside of their limits. The guaranties it affords against accusation of capital or infamous crimes, except by indictment or presentment by a grand jury, and for an impartial trial by a jury when thus accused, apply only to citizens and others within the United States, or who are brought there for trial for alleged offenses committed elsewhere, and not to residents or temporary sojourners abroad. Cook v. United States, 138 U.S. 157, 181, 11 S.Ct. 268 [34 L.Ed. 906]. The constitution can have no operation in another country. * * *"
Dorr v. United States, 1904, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 and Balzac v. People of Porto Rico, 1922, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627, were both concerned with the question whether constitutional guaranties were effective in territories acquired by the United States, but not yet incorporated as a part thereof. It was held in those cases that the guaranties were not applicable, the Court saying in the Dorr case in 195 U.S. at page 149, 24 S.Ct. at page 813:
"We conclude that the power to govern territory, implied in the right to acquire it, and given to Congress in the Constitution in article 4, § 3, to whatever other limitations it may be subject, the extent of which must be decided as questions arise, does not require that body to enact for ceded territory not made a part of the United States by Congressional action, a system of laws which shall include the right of trial by jury, and that the Constitution does not, without legislation, and of its own force, carry such right to territory so situated."
As the Bill of Rights is thus seen not to be operative in territory owned by the United States, but not officially absorbed into its corporate body, certainly its guaranties are not available to a person in the position occupied by the prisoner.
In Ex parte Bakelite Corporation, 1929, 279 U.S. 438, 49 S.Ct. 411, 73 L. Ed. 789, the Supreme Court considered in detail the authority of Congress under the Constitution to create legislative Courts. Citing In re Ross with approval, the Court said, 279 U.S. at page 451, 49 S.Ct. at page 413:
"The United States Court for China and the consular courts are legislative courts created as a means of carrying into effect powers conferred by the Constitution respecting treaties and commerce with foreign countries. They exercise their functions within particular districts in foreign territory, and are invested with a large measure of jurisdiction over American citizens in those districts. The authority of Congress to create them and to clothe them with such jurisdiction has been upheld by this Court and is well recognized."
The Court of Appeals for the Ninth Circuit considered a claim of right to release because of denial of a jury trial in Casement v. Squier, 9 Cir., 1943, 138 F.2d 909. The petitioner in that case had been convicted of murder by the United States Court for China. Relying on the Ross, Bakelite, and Dorr cases, the Court held that the District Court had properly dismissed the petition for habeas corpus. See also Madsen v. Kinsella, 1952, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988.
The prisoner applied for his job and voluntarily went to Japan as an employee serving with and accompanying the Army. He cannot claim to have been drafted or otherwise impressed into service. There is no question of a want of volition on his part, and the reasoning of the foregoing cases is clearly applicable to him. Accordingly, he *198 ought not to be heard to complain that by his own acts he placed himself beyond the reach of certain constitutional guaranties.

IV

Congress is empowered by the Constitution to authorize trial by court-martial of civilians associated with the land and naval forces.
In addition to the two constitutional considerations just discussed, there are other good reasons why the statute which now claims our attention is within the competence of Congress to enact under its constitutional powers. It is submitted that there is no prohibition in the Constitution which would inhibit the exercise of congressional authority in this regard. Moreover, on the affirmative side, there is in the Constitution a positive grant of authority to the Congress to enact such legislation. Article I, Section 8 of the Constitution in Clause 14 authorizes the Congress "To make Rules for the Government and Regulation of the land and naval Forces". This authority is supplemented by further authority "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."
The question of the proper interpretation and scope to be given the "Necessary and Proper" Clause of the Constitution was before the Supreme Court in the case of McCulloch v. Maryland, 1819, 4 Wheat. 316, 4 L.Ed. 579. The detailed reasoning of Chief Justice Marshall in that case is still valid now. The conclusions reached by John Marshall have remained the law of the land to this day. The following quotations provide adequate support for our interpretation of the "Necessary and Proper" clause:
"We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.
* * * * * *
"* * * Should Congress, in the execution of its powers, adopt measures which are prohibited by the constitution; or should congress, under the pretext of executing its powers pass laws for the accomplishment of objects not intrusted to the government; it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say, that such an act was not the law of the land. But where the law is not prohibited, and is clearly calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the decree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court disclaims all pretensions to such a power." 4 Wheat. 421, 423, 4 L.Ed. 579.
Careful examination of the Supreme Court opinion in the recent case of United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1 (7 November 1955) impels the conclusion that these tests, stated so long ago, would still be controlling in a case such as that which now confronts us. In the Toth case the Court considered, and struck down, Article 3 (a), Uniform Code of Military Justice, 50 U.S.C.A. § 553, which purported to make former servicemen subject to trial by court-martial for offenses committed by them while in service. The Court *199 reasoned, 350 U.S. at page 22, 76 S.Ct. at page 8:
"* * * It is impossible to think that the discipline of the Army is going to be disrupted, its morale impaired, or its orderly processes disturbed, by giving ex-servicemen the benefit of a civilian court trial when they are actually civilians. * * *
"* * * But Army discipline will not be improved by court-martialing rather than trying by jury some civilian ex-soldier who has been wholly separated from the service for months, years or perhaps decades."
And again, 350 U.S. at page 22, 76 S.Ct. at page 8:
"Determining the scope of the constitutional power of Congress to authorize trial by court-martial presents another instance calling for limitation to `the least possible power adequate to the end proposed.'" Citing Anderson v. Dunn, 6 Wheat. 204, 230-231, 5 L.Ed. 242. (Emphasis in original.)
Thus, in the clearest language, the Supreme Court implies that if the failure to try ex-servicemen by court-martial would disrupt discipline, impair morale, or disturb the orderly processes of the Army, such trials could be authorized under the Constitution. But the Court majority were of opinion that none of those results would flow from that failure, and accordingly that the statute was unconstitutional.
It seems reasonable to assume that the present action was inspired by a misconception of the Toth decision. However, the prisoner will find no comfort in Toth as a basis for his claim that as a civilian he is entitled to a jury trial. The Court remarked that the power "`To make Rules' to regulate `the land and naval Forces' would seem to restrict court-martial jurisdiction to persons who are actually members or part of the armed forces." The words "or part" clearly refer to some class of persons other than "members." As though to emphasize the point that Congress may make persons other than uniformed members of the armed forces amenable to trial by court-martial, the Court referred with approval to Kahn v. Anderson, 255 U.S. 1, 41 S.Ct. 224, 65 L.Ed. 469. That case held that a prisoner, who was a civilian by virtue of the execution of his dishonorable discharge, was properly made subject to military jurisdiction while serving confinement. See also Carter v. McClaughry, 1902, 183 U.S. 365, 383, 22 S. Ct. 181, 46 L.Ed. 236; McDonald v. Lee, 5 Cir., 1955, 217 F.2d 619.
Moreover, there can be no valid claim that the opinion of the Supreme Court in the Toth case is one of broad application. Throughout the opinion, the Supreme Court was at pains to emphasize that the opinion related only to Article 3(a), Uniform Code of Military Justice, 50 U.S.C.A. § 553.[2]
*200 We believe that the holding of the Supreme Court in the Toth case related solely to the statute there under consideration, namely, Article 3(a), Uniform Code of Military Justice, and that the reasoning by which the Court reached its decision supports the grant of court-martial authority where it is "Necessary and Proper," in the constitutional sense. Bearing in mind the scope of the "Necessary and Proper" Clause, as laid down by Chief Justice Marshall, it remains only to determine whether it is necessary to accomplishment of its mission that the Army have jurisdiction over its civilian employees and dependents who accompany its units overseas.
A serious problem of maintaining morale and discipline in the armed forces overseas is presented here. We take judicial notice that since before World War II U. S. Military forces operating outside the Continental United States have included a large civilian component as well as troops. The development of modern military techniques, now dictates that particularly in time of peace, this civilian contingent be almost as large as that wearing the uniform. Of necessity, a commander must have control over his entire force, including those who accompany his troops. Traditionally, he has accomplished this by the exercise of military jurisdiction over them, and this is the basis upon which the United States has geared its diplomatic agreements with foreign countries in which we have military bases. As a result of these arrangements, many of the concessions made to the civilian component of the force (e. g. tax and customs advantages, border crossing privileges, etc.) are conditioned upon military jurisdiction over the civilians involved. Therefore, for our commanders to have no jurisdiction over this large group of American civilians now in foreign countries would be intolerable, and might well necessitate withdrawal of the civilian contingent. The effect on the military forces of such a withdrawal would be disastrous.
It has been suggested that an alternative to military jurisdiction over this category of persons would be a Congressional extension of the Federal judicial system to cover them. Aside from the constitutional problems involved in such an extension, and the total inability of the Federal judicial system to reach most derelictions (e. g. violations of Commander's directives) there are some insurmountable impediments to such a procedure. Imagine, for example, the difficulties and expense involved in obtaining the attendance of witnesses without compulsory process. Consider also the problems presented in civilian communities in the United States by petty crimes, traffic offenses, and juvenile delinquency. It is clear that commanders must have some power of control over civilian personnel of the land and naval forces outside the Continental limits of the United States. This situation did not confront the Supreme Court in the Toth case.
It follows from what has been said that Article I, Section 8 of the Constitution empowers Congress to authorize the trial by court-martial of civilians who are accompanying the armed forces outside *201 the continental limits of the United States, as has been done by Article 2, Uniform Code of Military Justice.
The constitutionality of Article 2(11), Uniform Code of Military Justice, had not been tested in the Federal Courts until after the recent Toth decision. This fact is easy to understand because the provisions of that Article had formerly been incorporated in Article of War 2(d), 39 Stat. 651, which had been repeatedly considered by the Courts and found to be constitutional. A leading case in this field is Ex parte Gerlach, D. C.S.D.N.Y.1917, 247 F. 616. That case involved a civilian mate on an Army transport who was court-martialed on shipboard under Article of War 2(d) for willful disobedience. Judge Hand stated his holding, 247 F. at page 618:
"Section 8 of article 1 of the Constitution is the source of authority for the Articles of War. Congress is thereby given power to raise and support armies, to make rules for the government of land and naval forces, and to make all laws which shall be necessary for carrying into execution the foregoing powers and all other powers vested by the Constitution in the government of the United States. The Articles were enacted in pursuance of the general war power, and ought to be given a broad scope in order to afford the fullest protection to the nation. The act is, in my opinion, constitutional."
The Supreme Court has not passed directly on the present question, but in Duncan v. Kahanamoku, 1946, 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688, Mr. Justice Black, author of the Toth opinion, stated for the court, 327 U.S. at page 313, 66 S.Ct. at page 610:
"Our question does not involve the well-established power of the military to exercise jurisdiction over members of the armed forces, [or] those directly connected with such forces * * *."
As authority for that statement, the Supreme Court cited Ex parte Gerlach, supra; Ex parte Falls, D.C.N.J.1918, 251 F. 415; Ex parte Jochen, D.C.S.D. Tex.1919, 257 F. 200; and Hines v. Mikell, 4 Cir., 1919, 259 F. 28. In Falls, a civilian cook who deserted an Army transport in New York harbor was held properly subject to trial by court-martial under Article of War 2(d). Jochen related to a civilian who had been employed as a Superintendent of Quarter-master Corps with United States troops along the Mexican border. Declaring its duty was simply to determine whether the petitioner was a member of the land or naval forces, the Court said, 257 F. at page 204:
"That it is not necessary that a person be in uniform in order to be a part of the land forces, I think clear, not only upon considerations of common sense and common judgment, but upon well-considered and adjudicated authority. Some of the leading cases sustaining the jurisdiction of military courts over civilians attached to the army and navy are in In re Thomas, Fed.Cas.No. 13,888, 23 Fed.Cas. 931; United States v. Bogart, Fed.Cas.No. 14,616; In re Reed, Fed.Cas.No.11,636, 20 Fed.Cas. 409; Bogart's Case, Fed. Cas.No.1,596, 3 Fed.Cas. 796; Dynes v. Hoover, 20 How. 65, 15 L.Ed. 838; Ex parte Milligan, 4 Wall. [2] 123, 18 L.Ed. 281. Against these authorities I find no contrary expression."
In Hines v. Mikell, a civilian auditor at Camp Jackson, South Carolina, was held to be subject to Article of War 2(d).
Another opinion illustrative of the uniform holdings of the Federal Courts that Article of War 2(d), predecessor to Article 2(10 and 11), Uniform Code of Military Justice, is constitutional, is that of the District Court in Grewe v. France, D.C.Wis.1948, 75 F.Supp. 433. In that case a seaman left employment with the Merchant Marine in November 1945, at Antwerp, Belgium, and obtained a permit to enter Germany where he secured employment with the U. S. Army. Thereafter charges were preferred *202 against this employee, who then terminated his employment prior to the trial by court-martial. In holding that the Petitioner was subject to military jurisdiction, the Court said, 75 F.Supp. at page 437:
"I find no difficulty in agreeing with the doctrine pronounced in the quotation hereinabove from Judge Hand's opinion in the Gerlach case. It would be an unwarranted and strained construction of the Fifth Amendment to conclude that the exception referred only to sworn-in members of the land or naval forces who wear uniforms. As wars are fought, those in uniform are of-times dependent upon the help and assistance of others who, for one reason or another, are not uniformed members of the Army and naval forces, but who work in very close relationship therewith. I hold that Article 2(d) is constitutional." (Emphasis supplied.)
The justification and necessity for making civilians who accompany the Army outside the continental limits of the United States amenable to trial by court-martial was pointed out by the Court In re Di Bartolo, D.C.S.D.N.Y. 1934, 50 F.Supp. 929. The Court, considering Article of War 2(d), stated, 50 F.Supp. at pages 932, 933:
"The statutory foundation for the asserted military jurisdiction over the petitioner is the cited statute and our principal inquiry is whether the petitioner falls within the stipulated categories. The history of the article throws light upon its meaning. The word `accompanying' which appears in 39 Stat. 650 was absent from the predecessor article from which it was derived, Article of War 63, Revised Statute § 1342. The latter Article read: `All retainers to the camp, and all persons serving with the armies of the United States in the field, though not enlisted soldiers, are to be subject to orders, according to the rules and discipline of war.'
"The 64th Congress made the change when it enacted the Articles of War of 1916. At the legislative hearings held upon the bill, Major General Crowder, Judge Advocate General, made statements which are incorporated in the transcript of the hearing annexed to the Senate Report, Senate Report No. 130, 64th Congress, First Session.
"`Subhead (d) of article 2, which corresponds to article 63 of the existing code, introduces the words "All persons accompanying", so as to make subject to the article a class of persons who do not fall under the designations, "retainers to the camp," and "persons serving with the armies in the field," employed in the existing law, and additional words are introduced so as to confer jurisdiction over all three classes of persons, to wit (a) retainers, (b) persons accompanying, and (c) persons serving with the armies of the United States in the field, in time of peace, whenever the Army is serving outside the territorial jurisdiction of the United States. At present jurisdiction is limited to classes (a) and (c) and to a period of war. The purpose is to give full disciplinary authority over these three classes of persons when the army may be in peaceful transit through a foreign country, or where, as in Cuba in 1906, there is intervention in a foreign country falling short of war.' (p. 30).
"`We now come to subhead (d), and here there is a change in the law which will claim your attention. In the present condition of our Articles of War "retainers to the camp" (i. e., officers' servants, newspaper correspondents, telegraph operators, etc.), and "persons serving with the armies in the field" (i. e., civilian clerks, teamsters, laborers, interpreters, guides, contract surgeons, officials, and employees of the provost marshal general's department, officers and men employed on transports, *203 etc.) are made subject to the Articles of War only during the period and pendency of war and while in the theater of military operations. A number of persons who manage to accompany the Army, not in the capacity of retainers or of persons serving therewith, are not included. They constitute a class whose subjection to the Articles of War is quite as necessary as in the case of the two classes expressly mentioned. Accordingly the article has been expanded to include also persons accompanying the Army. The existing articles are further defective in that they do not permit the disciplining of these three classes of camp followers in time of peace in places to which the civil jurisdiction of the United States does not extend and where it is contrary to international policy to subject such persons to the local jurisdiction, or where, for other reasons, the law of the local jurisdiction is not applicable, thus leaving these classes practically without liability to punishment for their unlawful acts under such circumstances  as, for example, where our forces accompanied by such camp followers are permitted peaceful transit through Canadian, Mexican, or other foreign territory, or where such forces so accompanied are engaged in the nonhostile occupation of foreign territory, as was the case during the intervention of 1906-7 in Cuba.' (pp. 37, 38.)"[3]
It has been held that one who ministered to the health and welfare of employees of an Army contractor engaged in salvage operations without the territorial jurisdiction of the United States did in fact "accompany" the Army, Perlstein v. United States, supra, and that termination of employment does not necessarily terminate accompaniment, for a civilian can still accompany an armed force after his employment has ceased. Perlstein, supra; In re Di Bartolo, supra; Grewe v. France, supra.
Although, as indicated, until recently Article 2(11), Uniform Code of Military Justice, had not been tested in the Federal Courts, the United States Court of Military Appeals has repeatedly upheld the jurisdiction of courts-martial over civilians under the provisions of Article 2(10 and 11) of the Code. See United States v. Marker, 1 USCMA 393, 3 CMR 127; United States v. Weiman, 3 USCMA 216, 11 CMR 216; United States v. Grisham, 4 USCMA 694, 16 CMR 268; United States v. Garcia, 5 USCMA 88, 17 CMR 88; United States v. Robertson, 5 USCMA 806, 19 CMR 102. There is thus an overwhelming array of precedents in both the Federal and military courts upholding the constitutionality of Article of War 2(d) and Article 2(10 and 11), Uniform Code of Military Justice.
Since the Supreme Court decision was announced in United States ex rel. Toth v. Quarles, three habeas corpus cases attacking the constitutionality of Article 2(11), Uniform Code of Military Justice, have already been decided.
The first such case to be decided was that of Covert v. Reid (not reported) which was decided by the District Court for the District of Columbia on 22 November 1955. Clarice Covert was the wife of an airman stationed in England. While living there with him, Mrs. Covert murdered her husband. She was tried in England by a general court-martial convened by the U. S. Air Force, and upon conviction of premeditated murder was sentenced to life imprisonment. She was returned to the United *204 States and confined at Alderson, West Virginia. Thereafter, the Court of Military Appeals reversed the conviction and authorized a rehearing. The Secretary of the Air Force then directed that a rehearing be held at Bolling Air Force Base, Washington, D. C. Prior to the rehearing Mrs. Covert was transferred to the District of Columbia, where she filed a petition for a writ of habeas corpus in the District Court. The writ was granted. One of the important distinctions between that case and this case is well illustrated by the dramatic and accurate statement made by counsel to open his case on behalf of Mrs. Covert in the District Court:
"Mr. Wiener: If the Court please, the question in this case is whether a woman, who all of her life has been a civilian, may be tried by an Air Force court martial in time of peace here in the District of Columbia and literally within the shadow of the Capitol dome."
In deciding the Covert case, Judge Tamm said from the bench that "a civilian is entitled to a civilian trial." This statement appears to be so broad as to conflict with the holding of the Supreme Court in the Toth case. The Court there held only that "Congress cannot subject civilians like Toth to trial by court martial." Whether the Covert case is right or wrong, the case is easily distinguished from the one now before this Court. It must be remembered that in the Covert case the question confronting the Court was whether the petitioner could be again tried in the United States. The prisoner, Varney, has already been tried, and his trial was held at a place and time where he was subject to the Uniform Code of Military Justice.
The next case to be decided was that of Hurlahe v. Wilson (not reported) decided by the District Court for the District of Columbia on 4 January 1956. That case involved one Hugh Hurlahe, who on 3 November 1949 was relieved from active duty as Second Lieutenant in the United States Army at Nuernberg, Germany, to accept civilian employment with the United States Army. On 17 July 1953 he was suspended from his civilian position pending administrative investigation of alleged irregularities. Court martial charges were served on him 31 July 1953. On 3 August 1953 Hurlahe fled to Switzerland. Two days later he surrendered his passport (as a United States employee in Germany) to the United States Consulate at Zurich, Switzerland, and obtained a passport indicating that he was in a tourist status. By letter, dated 14 August 1953, Hurlahe submitted his resignation as an employee of the Army. That resignation was accepted, effective 18 August 1953 "to assume a tourist status." The two years from 11 October 1953 until 1 November 1955 were devoted to extradition proceedings in the Swiss courts to procure Hurlahe's return to Germany. On 1 November 1955 he was returned to Germany and in mid-December 1955 his trial on other court-martial charges was begun. On the basis of the foregoing facts, the Court held that the Hurlahe case is governed by United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1. The differences between Hurlahe's situation and that of Louis B. Varney, the prisoner herein, are obvious.
The most recent of these cases to be decided is that of United States ex rel. Krueger v. Kinsella, 137 F.Supp. 806, decided by the District Court for the Southern District of West Virginia on 16 January 1956. In that case retired Lieutenant General Krueger sought the release of his daughter, Dorothy Smith, who is serving a life sentence for the murder of her husband. Mrs. Smith was tried and sentenced by an Army general court-martial in Japan in 1953. In a written opinion Judge Ben Moore upheld the constitutionality of Article 2 (11), Uniform Code of Military Justice, and its application to dependents who accompany servicemen overseas.
For the reasons stated, the writ will be discharged, the petition dismissed and the prisoner remanded to the custody of the respondent.
NOTES
[1] For a recent case in which habeas corpus was denied for a failure to exhaust state remedies, see United States ex rel. Touhy v. Ragen, 7 Cir., 1955, 224 F.2d 611.
[2] The opinion begins by stating that Toth "was taken to Korea to stand trial before a court-martial under authority of a 1950 Act of Congress", and Article 3 (a) is set out in the margin at that point, 350 U.S. at page 13, 76 S.Ct. at page 3. It is next stated that "The 1950 Act cannot be sustained" under certain listed provisions of the Constitution, 350 U.S. at page 13, 76 S.Ct. at page 3. Next, the Court opined that "To allow this extension of military authority would require an extremely broad construction" of the Constitution, 350 U.S. at pages 14-15, 76 S.Ct. at page 4. This statement is followed by the assertion that "any expansion of court-martial jurisdiction like that in the 1950 Act necessarily encroaches on the jurisdiction of federal courts". 350 U.S. at page 15, 76 S.Ct. at page 4. A paragraph devoted to analyzing the possible effects of Article 3(a) is begun by a reference to "The 1950 Act here considered". 350 U.S. at page 19, 76 S.Ct. at page 6. Consideration is given to its effect on veterans "discharged since passage of the 1950 Act". 350 U.S. at page 19, 76 S.Ct. at page 6. Then the Court speaks of jurisdiction under "the present law" and stated "there is no justification for treating the Act as a mere minor increase of congressional power to expand military jurisdiction. It is a great change, both actually and potentially." 350 U.S. at page 20, 76 S.Ct. at page 7. Next, the Court considers what the effects may be if "this law is not sustained". 350 U.S. at page 20, 76 S.Ct. at page 7. It is stated that fear in this connection "was not shared by the Judge Advocate General of the Army who made a strong statement against passage of the law." 350 U.S. at page 21, 76 S. Ct. at page 7. At that point appears a footnote referring specifically to Article 3(a). The Court says further that "considerations of discipline provide no excuse for new expansion of court-martial jurisdiction". 350 U.S. at page 22, 76 S.Ct. at page 8. As if these expressions were not sufficient to drive home the point that the Court's opinion is limited strictly to Article 3(a), Uniform Code of Military Justice, the Court stated in conclusion: "We hold that Congress cannot subject civilians like Toth to trial by court-martial." 350 U.S. at page 23, 76 S.Ct. at page 8. (All emphasis in foregoing quotations supplied.)
[3] For additional decisions upholding the constitutionality of Article of War 2(d), the predecessor of Article 2(11) of the Uniform Code, see McCune v. Kilpatrick, D.C.E.D.Va.1943, 53 F.Supp. 80; Perlstein v. United States, 3 Cir., 1945, 151 F.2d 167, certiorari granted 327 U.S. 777, 66 S.Ct. 956, 90 L.Ed. 1005, dismissed 328 U.S. 822, 66 S.Ct. 1385, 90 L.Ed. 1602; In re Berue, D.C.Ohio 1944, 54 F.Supp. 252; United States ex rel. Mobley v. Handy, 5 Cir., 1949, 176 F.2d 491, certiorari denied 338 U.S. 904, 70 S.Ct. 306, 94 L.Ed. 556.